238

COPPAGE, Rec'r for Security Financial Insurance
Corporation v. MARYLAND THRIFT SAVINGS
AND LOAN COMPANY, et al.

[No. 155, September Term, 1968.]

*Decided April 30, 1969.*

The cause was argued before HAMMOND, C. J., and MAR-BURY, BARNES, SINGLEY and SMITH, JJ.

*James P. Garland* and *Albin M. Plant,* with whom was *George D. Hubbard* on the brief, for appellant.

*Stedman Prescott, Jr.,* for appellees.

SMITH, J., delivered the opinion of the Court.

This is a battle between two receivers. Appellant John H. Coppage (Coppage) is receiver for Security Financial Insurance Corporation (Security). Appellee J. Ingram Medley (Medley) is receiver for Maryland Thrift Savings and Loan Company (Maryland Thrift). Coppage is operating under the jurisdiction of the Circuit Court of Baltimore City. Medley is under the jurisdiction and control of the Circuit Court for Montgomery County. Coppage as receiver of Security filed a claim against Maryland Thrift. Judge Shure sustained Medley's exceptions to the claim. We reverse the action of Judge Shure, for the reasons stated herein.

This litigation might be called a by-product of the Maryland savings and loan difficulties of a few years ago and might also be called a direct result of a failure to adhere to the procedures prescribed for receivers in Maryland Rules BP 1 to 10, inclusive.

A petition was filed on April 18, 1962, requesting appointment of a receiver for Maryland Thrift. Security had issued a policy of insurance insuring the free shareholders of Maryland Thrift against loss. Therefore, Security filed a petition to intervene as a party defendant. Mr. Medley was appointed receiver

of Maryland Thrift on August 3, 1962, and qualified on the same day. Some time prior to August 2, 1962, (the exact date does not appear in the record) Coppage (as Deputy Insurance Commissioner) was appointed receiver for Security.

Prior to either receivership, Security loaned Maryland Thrift $40,000.00 on January 9, 1962, and $38,000.00 on January 17, 1962. In each instance demand promissory notes were executed calling for interest at the rate of six percent per annum and there were pledged to and deposited with Security certain first deeds of trust owned by Maryland Thrift. After Medley's appointment as receiver, the Circuit Court for Montgomery County authorized the appointment of an accountant to examine the books and records of Maryland Thrift. The report filed by that accountant under date of November 15, 1962, noted these loans, stated that the amount payable on the books of the corporation as of August 3, 1962, was $78,000.00 and listed seven mortgages which the accountant said had been pledged by Maryland Thrift to Security as collateral for these notes. The accountant indicated that he did not confirm with Security either the amount of the notes or that the mortgages were in fact held by Security.

On September 6, 1962, counsel for Medley addressed a letter to Coppage stating that it was his understanding that Security had been holding as collateral, to secure the repayment of $78,000.00 borrowed by Maryland Thrift, certain mortgages or deeds of trust to Maryland Thrift. He indicated a desire to discuss "the possibility of making a sale of those mortgages, if possible, to obtain whatever value possible in order that Maryland Thrift's debt to Security Financial might be paid and to secure the balance for the benefit of Maryland Thrift's depositors". Coppage replied requesting that counsel for Medley contact Peter Parker, Esq., then one of his attorneys, to discuss the matter with him. Apparently there followed various telephone conversations. As a result, on August 5, 1963, Mr. Parker forwarded mortgage files on three loans held by Security as security for the loan to Maryland Thrift, stating, "It is my understanding that you will have Substitute Trustees appointed and will proceed to foreclose on these mortgages with the hope that you will be able to retire the loan between Maryland Thrift and Security Financial in full."

Medley filed a petition through counsel on August 8, 1963, with the Circuit Court for Montgomery County requesting the appointment of a substitute trustee under several deeds of trust and for authorization to foreclose certain deeds of trust. The petition included the following:

> "That among the assets of the aforesaid Savings and Loan Company, your Petitioner has found the following described Deeds of Trust which were pledged to Security Financial Insurance Corporation to secure a loan to Maryland Thrift Savings and Loan Company of $78,000.00, which obligation is still outstanding, and the Receiver has released them to your Petitioner for the purpose of foreclosures, because they are now in default, with the understanding that any funds received will be applied on Maryland Thrift's obligation to Security Financial Insurance Corporation * * *."

The petition then went on to list three of the deeds of trust which had been assigned to Security. The record discloses yet another petition was filed on January 27, 1964, with identical language relative to the $78,000.00 asking for the appointment of substitute trustees for three more deeds of trust.

On October 2, 1964, counsel for Medley asked counsel for Coppage for the figures necessary to pay the principal and interest that Maryland Thrift owed Security. A reply under date of October 8, 1964, stated:

> "As to the principal and interest owed Security Financial Insurance Corporation by Maryland Thrift S. & L. Association under the loan dated January 7, 1962, the amount owed as of October 17, 1964, is $44,624.68 with interest accruing at the rate of $214.32 for each month thereafter. Upon payment of the above sum, we will deliver to you the collateral pledged against same, which, in the opinion of Mr. Coppage, the Receiver of Security Financial Insurance Corporation, and real estate experts retained by him, is well in excess of that amount." (emphasis added)

On December 4, 1964, counsel for Medley wrote counsel for

Coppage saying that he was enclosing the check of Medley to pay the obligation of Maryland Thrift to Security "in full." The check was in the amount of $44,774.70. He asked for an acknowledgement of receipt of the check by signing an enclosed copy of the letter and returning it. This copy was not signed and returned, but on December 14 counsel for Coppage wrote counsel for Medley in part as follows:

"There are a few loose ends which I would like to tie up so that this matter may be fully and finally disposed of and the file closed.

"You will recall my letter of October 8, 1964 in which I set forth the amount owed as calculated by Mr. Coppage and the Circuit Court for Baltimore City. It appears that you calculated the additional interest due based on November 17, 1964 instead of October 17, 1954 (sic) and that, accordingly, Mr. Medley still owes Mr. Coppage $214.32. I would appreciate it if you would send me that amount when convenient."

On December 29 counsel for Coppage wrote counsel for Medley in part as follows:

"One final matter remains to be cleared up and that is covered by the second paragraph of my letter to you dated December 14, 1964 concerning the amount of $214.32 which is still owed by Mr. Medley to Mr. Coppage. Please let me know when you plan to send me this amount so that our files in this regard may be closed."

The check enclosed with the December 4 letter had marked on the front of it, "Full settlement of Md. Thrift obligation". Counsel for Medley filed a petition with the Circuit Court for Montgomery County on October 28, 1964, alleging that there was due Security as of October 17, 1964, $44,624.68 plus interest at the rate of six percent and asking leave to pay that amount. The petition does not say this was the only obligation of Maryland Thrift to Security. The order of court granting leave to Medley to pay this sum, however, described it "as full payment of the obligation" of Maryland Thrift to Security.

Pursuant to an order of court passed on August 17, 1962, directing Medley to "publish a Notice to Creditors in accordance with Rule BP 4 * * *", giving notice that creditors should file their claim with the Clerk of the Circuit Court for Montgomery County "before a specified date, which shall be not less than One Hundred Twenty (120) days from the date of the order of publication", Medley duly published notice to creditors notifying creditors to file their claims "on or before the 26th day of December, 1962; otherwise they may by law be excluded from all benefits of said Receivership Estate."

On November 10, 1967, almost five years after expiration of the notice, Coppage filed claim for the sum of $40,000.00 together with interest thereon from January 9, 1962, until paid at the rate of six percent per annum, reciting the loan of cash in the amount of $40,000.00 on January 9, 1962. Appended to the claim was a copy of the note in that amount bearing that date from Maryland Thrift to Security.

Medley excepted to the Coppage claim stating:
> "That laches should be applied against John H. Coppage, Receiver of Security Financial Insurance Corporation in that he delayed unnecessarily in filing his claim in this cause, and in that he misinformed the Receiver for Maryland Thrift Savings and Loan Association, Inc. about the amount of his claim, all of which caused said Receiver to act without considering the additional amount now claimed."

and that Maryland Thrift was entitled to a setoff on the ground that Security is indebted to Maryland Thrift in the amount of $333,639.23 as a result of having insured the savings share accounts of Maryland Thrift.

It may well be that no exceptions would have been filed to this claim were it not for the fact that on September 22, 1965, the chancellor authorized, upon Medley's petition, distribution to depositors of a dividend of 42%. Medley said this "would leave [Medley] adequate funds on hand to take care of any expenses and other contingencies that might be incurred such as attorney's fees, accountant's fees, receiver's commissions and other expenses."

A partial distribution is authorized under Maryland Rule BP 10 b which states in pertinent part:

"The court, in its discretion, upon application of the * * * receiver * * * may direct such partial distribution as may be safely made from the money in the hands of the * * * receiver to those creditors whose claims are not in dispute, *reserving sufficient assets to secure, after final settlement of all claims, a proportionate distribution among all creditors whose claims are finally allowed.*" (emphasis added)

There are four questions presented in this appeal, (1) whether the claim on behalf of Security was filed at the proper time, (2) whether the claim should have been denied on the basis that Medley was led to believe that the obligation from Maryland Thrift to Security had been paid, (3) whether "the equities are such that the loss, if any, should be at the hands of the claimant and not the receiver for Maryland Thrift", as stated by the chancellor, and (4) whether the claim should have been denied on the basis of a setoff under the insurance policy issued by Security.

## I.

Coppage contended that under Maryland Rule BP 4 his claim was not late. Maryland Rule BP 4 c states in pertinent part:

*"Claims Filed After Date Specified in Order.*
"1. Late Filed Claims Allowable—Conditions.
"A valid claim filed after the date specified in the court order passed pursuant to section a of this Rule, *but prior to the date of reference to the auditor for the stating of an account, shall be entitled to distribution as though filed by the specified date.*" (emphasis added)

Maryland Rule BP 9 c states:

"All final reports and all other reports which are filed for the purpose of making a partial or total distribution of the estate *shall be referred to an auditor.* The auditor shall audit the report and state an account setting forth the distribution of the estate, but not, in-

sofar as possible, restating the items contained in the report." (emphasis added)

The rule than goes on to require the auditor to give written notice of the stating of the account to, among others, each creditor who had filed a claim in the proceeding, the notice to contain certain specified information relative to assets, liens, priorities, expenses, the amount available for distribution to general creditors, the percentage of distribution, whether the distribution is final or partial and that the account will be finally ratified and confirmed at a designated time unless exceptions are filed prior thereto. It is undisputed that this case has never been referred to a court auditor.

On the matter of the timely filing of the claim the chancellor said:

"The claimant, Coppage, urges that their claim was timely filed because under Rule BP4, c (1), it is provided that a claim shall be entitled to be recognized as though filed by a specific date, if it is filed prior to the date of reference to the Auditor for the stating of an account, and that all final reports and all other reports which are filed for the purpose of making a partial or total distribution shall be referred to an Auditor, etc. This argument is not persuasive to the Court, since this claimant is a party to the proceedings and was from June 1, 1962, but more importantly, the reason for said rule is to assure full disclosure, through audit examination, where no special auditor has been appointed or where insufficient time has elapsed to fully protect the interests of a bona fide creditor. In this Receivership case, as in any other case involving fiduciaries, no distribution should be made until the affairs of the company, or the individual, have been audited and it has been ascertained what in fact are the assets and liabilities in order to prevent speedy payment of unfounded claims. As was stated in Mendelis v. Broening (168 Md. 488) the purpose of requiring an audit is to give an opportunity for one to object and show injury. In the instant case, Security was a

party to the proceedings, and aware of the situation from the outset and there was a complete audit prior to any distribution. Mendelis v. Broening is strongly relied upon by the claimant, but is clearly distinguishable. While it is not clear whether the C.P.A. audit was made in that case before or after the appointment of a Receiver, the claimants there had 'recently learned' of the status of the affairs and the claimants were in the process of analyzing the Report of the Receiver, which included the audit, but the Court, nevertheless, authorized distribution forthwith and before claimants were given any opportunity to object to show injury. The Court there pointed out that 'they were deprived of the opportunity of making the objections and filing exceptions to the allowance of such claims as might be improper.' In the instant case, we have no such set of circumstances, as the State of Maryland filed its original Petition in behalf of Maryland Thrift and it has been completely familiar, also, with the Receivership case of Security from the outset. The State [1] now appears to object to a matter which has been peculiarly within its knowledge for approximately six years and in face of the Notice to Creditors published in Montgomery County, in December, 1962, to which they did not respond. Other creditors did file their claims at that time, including the Maryland Division of [U]nemployment Insurance of the Maryland Department of Employment Security. In this case, the Court authorized the partial distribution to creditors, being of the definite opinion that no further Court audit prior to distribution was necessary in

---

1. Apparently some confusion existed in the mind of the chancellor because James P. Garland participated in the original petition for receivership for Maryland Thrift as an Assistant Attorney General, and now appears as counsel for Coppage, being no longer an Assistant Attorney General. The Director of the State Department of Assessments and Taxation filed, pursuant to statute, the original petition to have a receiver appointed for Maryland Thrift while the State Insurance Commissioner filed the petition relative to Security.

view of the detailed reports of the Auditor, A. W. Thompson, the first of such reports having been available to Security for analysis since November 15, 1962."

The chancellor referred to Coppage as being a party, which he never was. The corporation for which he is a receiver was made a party prior to the appointment of Coppage as receiver. No order ever made Coppage a party. Moreover, Medley did not treat Coppage as a party entitled to service of a copy of the petition for partial distribution or copies of other papers filed.

Medley was conscious of the Coppage claim almost from the inception of the receivership. Its full amount was reflected in the accountant's first report to Medley. Its full amount was twice reflected in petitions filed by Medley in the receivership proceeding. Medley paid on that claim a sum which he thus knew to be equal to approximately half of the claim, without making inquiry of Coppage as to whether there was an additional sum due and after he and his accountant had concluded that no part of the obligation to Security had been paid. Now, notwithstanding those facts and the further fact that the order of court required a notice to creditors "in accordance with Rule BP 4", Medley urges that he is protected from the claim because of the inapplicability of the late filing provisions of Rule BP 4. He contends that the language of Rule BP 1 (b) excludes statutory receivers. If we were to assume, *arguendo,* that he is correct in this assumption, the next question which would logically arise is what are the procedures governing a receiver in Medley's position? Medley was appointed a receiver under the provisions of Chapter 1 of the Acts of the Special Session of 1961.[2] Section 160L thereof provides in pertinent part:

"(a) *Appointment of receiver.* * * * ['T']he Director * * * may apply to an equity court for the * * * county * * * for the appointment of a receiver * * *.

---

**2.** Chapter 1 of the Acts of the Special Session of 1961 terminated when Chapter 205 of the Acts of 1961 was approved by the people at the General Election of 1962. Section 161L of Chapter 205 of the Acts of 1961 is identical with Section 160L of Chapter 1 of the Acts of the Special Session of 1961 and is now codified as Code (1966 Repl. Vol.) Art. 23, § 161L.

"(b) *Procedure.* The procedure in such receiver-ship action, shall be in all other respects in accordance with the practice in such court * * *."

What, then, is "the practice in such court"? "The practice in such court" relative to receivers is that spelled out in the BP subtitle, a codification of the prior chancery practice in Maryland. References to the earlier Maryland practice are found in Miller, *Equity Procedure* (1897). Section 540 provides in part:

"A creditor may come in and file his claim at any time before a distribution of the proceeds of sale has been actually made *under a finally ratified auditor's account.*" (emphasis added)

Section 537 provides in pertinent part:

"If an account consists of very few items it may not be necessary to refer the case to the auditor for adjustment, but the court in its discretion may perform this duty and ascertain the proper amounts without the aid of an audit; and so, if there is but a single item to be determined, which the court may ascertain, a reference to an auditor is unnecessary. And where a sum for distribution was so small that it would be wholly consumed in the expense of stating an account, the court considered it proper to distribute it as interest among those entitled, without the expense of another audit."

In *Mendelis v. Broening,* 168 Md. 488, 178 A. 238 (1935) this Court had before it the question of the necessity of reference to an auditor prior to a receivership distribution under the practice then existing. A building association had been placed in receivership on the petition of certain of its free shareholders. Just prior to Christmas the receiver filed his annual report, part of which was an audit or financial statement previously prepared by a *certified public accountant,* setting forth the financial position of the association as of that date. The receiver filed a petition seeking authority to pay in full the accounts of free shareholders with accounts of $5.00 or less and to pay a dividend to all

other free shareholders without having the court auditor first make an audit setting forth the basis for such distribution because of the time which the statement of such an account would consume, it being represented that the shareholders were urgently in need of funds at that season of the year. The chancellor authorized this action without first referring the matter to the court auditor as required by the then existing rules of his court. This brought an appeal to this Court.

Judge Johnson for this Court pointed out in *Mendelis* that the then language of Code (1924) Art. 16, § 19 providing for appointment of a court auditor and further providing (*as does our present Maryland Rule 595*) "all accounts to be stated, audited or settled by such court, shall be referred for such purpose to the auditor," etc. had existed as a part of the statutory law of this State without substantial change since the passage of Chapter 72 of the Acts of 1785. He then went on to say:

> "[T]he established practice in this state has been to refer to the court auditor such proceedings. The matter finally resolves into this question: Was this order, passed as we have observed in contravention of the generally accepted and established principles of equity jurisprudence in this state, improper? Appellee, while conceding the correctness of these general principles, nevertheless contends that in this particular case no injury was done appellants, or in any event any error which may have occurred can be adjusted when a formal audit is made, before a further dividend is declared. * * * In their petition for rescission of the order it was alleged that they had been engaged in attempting to analyze the statement or audit made by the certified public accountant, and were then in the process of analyzing the receiver's report, but by the court's action they were deprived of the opportunity of making objections and filing exceptions to the allowance of such claims as might be improper. As free shareholders they had rights which were entitled to protection, but if it should develop that by virtue of this order a dividend was paid to one or more persons not entitled

to receive it, and such parties were irresponsible financially, what redress could the court give them, even though such mistakes were shown in an audit thereafter made? * * *

"Concededly, the motives of the receiver and the chancellor were laudable, but this fact cannot justify so radical a departure from the settled and established chancery practice in this state, without an affirmative showing that appellants were uninjured thereby, a fact which is not shown from the record." *Id.* at 494-95.

In *Eastern Air Lines v. Phoenix*, 239 Md. 195, 210 A. 2d 515 (1965) Judge (now Chief Judge) Hammond said for this Court:

"The present rules reflect the earlier case law that, absent laches amounting to prejudice to others, late filing is permitted as a matter of course as to undistributed funds in the hands of the court." (citing authorities) *Id.* at 208.

In the current case we have no simple account (as mentioned in § 537 of *Miller*), but a complicated account with a substantial number of potential claimants. It is apparent that the General Assembly expected the procedure to be that applicable to other receivers in such courts. That procedure is as set forth in the BP subtitle of the Maryland Rules. The present rules are plain and unambiguous. Rule BP 9 c specifically requires an audit before any distribution is made. Rule BP 4 c provides in plain language that even though a claim is not filed within the time allowed by the notice to creditors, due consideration shall be given any claim filed before the audit. There has been no audit. Therefore, the claim was filed in proper time.

## II.

The chancellor found that Security was indebted to Maryland Thrift because of Security's having written insurance on savings share accounts and then, after reciting the apparent confusion relative to the sums paid, stated:

"The Receiver, Medley, his Accountant and his Attor-

ney, were all, therefore, led to believe that the entire obligation to Security had been paid * * *. No distribution to creditors or shareholders was made until after this payment to Security, and any further accounts stated between these two corporations must abide the result of present litigation in which Security is now involved, and which will ultimately determine the pro rata distribution under its various insurance accounts."

It is specifically noted that, despite the language in the letter of October 8, 1964, there is no loan dated January 7, 1962. The loans were dated January 9 and January 17. The letter referred to interest from October 17. The amount called for corresponded with interest on the January 17 loan.

Medley urges that the trial court's finding of fact that Medley was led to believe that the entire obligation of Security had been paid should not be reversed. There was testimony by Medley that he found what he believed to be the original $40,000.00 note in the Maryland Thrift files. After that statement, however, the record is:

"Q. You never did receive any information from the books and records of the corporation that the $40,000.00 note, that is, the note of January 9, 1962, had been paid, did you? A. I did not. I did not receive information to that effect."

The accountant testified that Medley made a specific inquiry of him relative to the indebtedness of Maryland Thrift to Security as a result of which they together went back through the Maryland Thrift records to make certain that "we were right with respect to what our records showed, namely the $78,000.00." The joint conclusion, so the accountant testified, was that no portion of the obligation had been paid then. It is true that counsel for Medley in his letter made inquiry as to the entire indebtedness due from Maryland Thrift to Security. Unfortunately, the reply limited itself to one note. Apparently, Medley did not think it necessary to make any further inquiry of Coppage or his counsel after he and the accountant had investigated the situation. Although we believe prudence would have dictated

further inquiry by Medley of Coppage, and in the absence of such inquiry Medley cannot have been misled by the misunderstandings arising from the correspondence with counsel for Coppage, we do not believe the chancellor's findings of fact to be controlling, because under the Maryland Rules the claim was timely filed.

III.

The chancellor said:

> "[T]he equities are such that the loss, if any, should be at the hands of the claimant, not the Receiver for Maryland Thrift."

The principle to which the chancellor apparently refers is set forth in 27 Am. Jur. 2d *Equity,* § 146 as follows:

> "It is an equitable principle that where litigants assert conflicting claims, and hence, loss or prejudice must be borne by one of them, the decision in the event that they are shown to have been equally 'innocent'—that is, ignorant of the harmful consequences of their acts—must be rendered against the party whose conduct brought about the prejudicial situation. In this respect it is frequently said that where one of two innocent parties must suffer, he through whose agency the loss occurred must bear it. Similarly, it is often said that where one of two parties, both guiltless of intentional wrong, must suffer a loss, the one whose conduct, act, or omission occasions the loss must stand the consequences. This principle does not apply, however, where there are no contending equities between the parties. Where parties are equally innocent and their equities are equal, equity generally follows the law."

Had Medley and the chancellor followed the procedures prescribed in the Maryland Rules, the claim of Security would now be barred. We cannot agree that the equities bar the Security claim where the very reason that the claim may now be considered is the failure of Medley to follow the prescribed procedures, procedures that have been a part of the Maryland chancery practice for generations.

## IV.

The chancellor found in essence that there was a right of set-off. Medley argues for that proposition.

Coppage points out, correctly, that for there to be set-off the debts to be off-set must be mutual, citing *Ghingher v. Fanseen,* 166 Md. 519, 526, 172 A. 75 (1934) ; *Tyrrell v. Tyrrell,* 54 Md. 167, 169 (1880) and *Hall's Adm'r. v. Creswell,* 12 G. & J. 36, 51 (1841).

Medley points out that the Circuit Court of Baltimore City on November 23, 1962, passed an order providing for claims to be filed in that proceeding by receivers such as Medley on behalf of depositors or free shareholders, the claims to be deemed the claim of the depositors or free shareholders. This does not make the debts mutual, however. Moreover, if the total amount ultimately to be distributed by the Security receivership proceeding to the Maryland Thrift shareholders were less than the amount of the Security claim against Maryland Thrift and we permitted this set-off as contended for by Medley, then the Maryland Thrift shareholders would be in the position of receiving a preference over other claimants in the Security proceeding.

We are not obliged in this opinion to work out the mechanics to be followed by Medley and the chancellor. We are obliged to pass on the propriety of the action of the chancellor in sustaining Medley's exceptions to the Coppage claim on behalf of Security. We hold the chancellor to have been in error.

*Order reversed and case remanded for further proceedings not inconsistent with this opinion: Costs to be paid one-half by the appellant and one-half by the appellees.*