## PENN GARDENS SECTION TWO *v.* MELNICK ET AL.

[No. 18, September Term, 1969.]

*Decided December 9, 1969.*

*Motion for rehearing filed January 8, 1970; denied February 2, 1970.*

The cause was argued on October 9, 1969, before HAMMOND, C. J., and BARNES, McWILLIAMS, SINGLEY and SMITH, JJ., and reargued on December 1, 1969, before HAMMOND, C. J., and BARNES, McWILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

*Robert B. Hirsch* at both arguments, with whom were *Charles R. Donnenfeld, Michael Evan Jaffe, Arent, Fox, Kintner, Plotkin & Kahn, Jerome Stanbury* and *Stanbury & Topf* on the brief, for appellant.

*Harry L. Ryan, Jr.* and *Nelson Deckelbaum* at both arguments, with whom was *Charles J. Steele* on the brief, for appellees.

SINGLEY, J., delivered the opinion of the Court.

This case presents a novel question: can the transferee of property from a lessor-mortgagor which had assigned its lease as additional security for the performance of the covenants of a mortgage on the leased property recover damages from lessees of the property on the theory that their failure to perform the lease covenants occasioned a foreclosure of the mortgage and the loss of the transferee's reversionary interest in the property? Since we propose, under the facts before us, to answer this question in the negative, we do not reach a second question relating to the measure of damages.

The facts can be more readily understood if the several parties in interest are identified:

*The Penn Gardens Apartments* or the *Apartments:* A portion of an apartment project located in Prince George's County, Maryland, containing 323 units.

*The Penn Gardens Partnership* or the *Partnership:* Penn Gardens Section Two, a limited partnership, the

plaintiff below and appellant here, and owner of the Penn Gardens Apartments.

*The Melnick Group:* Daniel Melnick, Melvin A. Robinson, Nick Basiliko and Jerry Wolman, together with their wives, who were the defendants below and are the appellees here, the lessees of the Apartments.

*T.I.A.A.:* Teachers Insurance and Annuity Association, holder of the first mortgage [1] on the Apartments.

*A.I.C.:* A.I.C. Financial Corporation, holder of the second mortgage [2] of $500,000 on the Apartments.

*The Penn Gardens Corporation* or the *Corporation:* Penn Section Two, Inc., a Maryland corporation, which as Penn Gardens Partnership's immediate predecessor in title, mortgaged the Apartments to A.I.C., leased the Apartments to the Melnick Group, and assigned the lease to A.I.C.

In May, 1964, the Melnick Group, the owners of the Penn Gardens Apartments, sold the Apartments to the Penn Gardens Corporation for $650,000, subject to an existing first mortgage held by T.I.A.A. on which there was an unpaid balance of $2,474,500. In order to finance the portion of the purchase price payable in cash, the Corporation borrowed $500,000 from A.I.C., and secured this loan by giving a second mortgage on the Apartments. The mortgage, by its terms, matured at the end of three years, on 11 May 1967. No payments in reduction of principal were required prior to maturity, but interest was to be at the rate of 10% per annum, payable in monthly instalments.

The Corporation then leased the Apartments to the Melnick Group for a term of 10 years, under a net lease, which called for an annual rent of $78,000, together with additional rent of $16,550 per month, the latter being equivalent to the amount of the monthly payments on the T.I.A.A. mortgage and of the payment of all property

1., 2. The "mortgages" discussed in the opinion were actually borrowings evidenced by notes secured by deeds of trust, which we have described as "Potomac mortgages." See *Weidemeyer v. Brekke,* 248 Md. 175, 180, 235 A. 2d 718 (1967).

expenses by the lessees. The Melnick Group also had the right under the lease to repurchase the property at any time after the first year, subject, however, to the T.I.A.A. mortgage, at prices ranging from $840,000 in the second year to $1,040,000 in the tenth year. The lease was immediately assigned by the Corporation to A.I.C. as additional security for its mortgage. The Corporation then transferred whatever interest it had in the Apartments to the Penn Gardens Partnership.

The record makes it clear that from and after the date of the closing, A.I.C. collected the monthly payments of rent and additional rent from the Melnick Group; made the payments of principal and interest on the T.I.A.A. mortgage; deducted the interest on the A.I.C. mortgage, and remitted the balance to the Partnership.

This typical sale and lease-back arrangement appears to have been in some difficulty from about August of 1965 because of delayed payments, indifferent management and lack of maintenance of the Apartments. By early 1967, T.I.A.A. was threatening foreclosure. The A.I.C. mortgage came due on 11 May 1967, and was not paid, although the Partnership had been notified that it would not be renewed. The Melnick Group made the last rent payment in July of 1967; in October of 1967, T.I.A.A., to which rents payable by occupants of the Apartments had been previously assigned, had a receiver appointed to collect those rents. In November or December of 1967 A.I.C. instituted foreclosure proceedings, and purchased the Apartments at the foreclosure sale on 8 January 1968.

On 7 December 1967, when A.I.C.'s foreclosure action was either pending or threatened, the Penn Gardens Partnership sued the Melnick Group in Prince George's County for arrearages of rent, for additional rent, and for damages occasioned by the Melnick Group's failure to observe the covenants of the lease, including damage to the Partnership's equity in the Apartments.[3] Four days

---

3. It would appear that at the trial below, and certainly in the

later, the Melnick Group entered into an agreement with the Partnership and A.I.C. which permitted reentry by the Partnership as "landlords" and A.I.C. as assignee of the lease from the Penn Gardens Corporation, but reserved whatever rights the Partnership and A.I.C. might have against the Melnick Group.

The Group filed a general issue plea, and specially pleaded as a defense that the Partnership's claims "are subject to disposition in one or more other pending actions." This referred to several suits which A.I.C. had brought against the same defendants on virtually the same cause of action in the U. S. District Court for Middle District of Florida. The first of these was filed on the same day the Partnership sued in Prince George's County, and by the time the Partnership's suit came on for trial, A.I.C. had settled for $132,000 its claim against the Melnick Group for breach of the covenants of the lease and had given them a release.

The case now comes to us on appeal from an order entered below, dismissing the Partnership's suit. The thrust of the Partnership's argument is that even after the assignment of the lease to A.I.C., the Partnership, which had succeeded to the Corporation's rights as the owner of a reversionary interest following a lease for a term of years, could maintain an action for injury to that interest, although the lease had been assigned by the Corporation to A.I.C., and never by the Corporation to the Partnership. The court below concluded that when the Penn Gardens Corporation assigned to A.I.C. the lease with the Melnick Group, all of the lessor's rights under the lease had been transferred to A.I.C. and "there was nothing left for the [Partnership] to sue upon."

The Partnership argues that the assignment of the lease was only an assignment of the rent and of the covenants relating to their collection. As a consequence, it maintains that the existence of the assignment did not

---

presentation of the case before us, the recovery sought was not for arrearages of rent and additional rent, but for damages occasioned by the loss of the equity through foreclosure.

deprive the Partnership of its right to recover for damage to the reversion occasioned by the failure of the Melnick Group to observe the lease covenants. It was this breach, the Partnership says, which ultimately resulted in the loss of the reversion through foreclosure.

In support of the proposition that the assignment related only to the rents and left unaffected the rights of the owner of the reversion, the Partnership refers us to 32 Am. Jur. *Landlord and Tenant* § 78 (1941) at 90; *Bellows v. Ziv*, 38 Ill. App.2d 342, 187 N.E.2d 265 (1962) ; *Winnisimmet Trust, Inc. v. Libby*, 232 Mass. 491, 122 N. E. 575 (1919) ; *Morehouse v. Woodruff*, 218 N. Y. 494, 113 N. E. 512 (1916) and *Bordereaux v. Walker*, 85 Ill. App. 86 (1899).

As we see it, in the usual case this is probably a correct statement of an abstract proposition of law. It is the view taken by 1 Tiffany, *Landlord and Tenant* § 146 b (2d Ed.) (1910) at 868-69:

> *"Transfer of 'lease.'* Not infrequently one finds a mention of the transfer or assignment of the 'lease' by a lessor, and occasionally this expression is used, apparently, as synonymous with a transfer of the reversion. Such expression can, it is submitted, properly be used only of a transfer by the lessee or his assignee, the word 'lease' being in such case used elliptically, as it is frequently used in other connections, to designate the estate created by the lease, the leasehold interest. The expression 'transfer of a lease,' when used with reference to a transfer by the lessor, cannot well refer to a transfer of the estate in reversion, since such estate exists independently of the lease, though it is not reversionary in character until after the lease has been made, and the only meaning which can properly be attached to this mode of expression is a transfer by the lessor of the rights created in his favor by the lease, so far as they can ex-

ist independently of and apart from the reversion, the chief, and usually the only one of which, is that to rent. A transfer or assignment of a lease, when spoken of as the act of the reversioner, should therefore, it seems, ordinarily be regarded as meaning merely a transfer of the rent to become due, with perhaps any rights created by covenant on the part of the lessee looking towards the collection of the rent rather than the protection of the reversion, and the expression, at best one to be avoided owing to its ambiguity, is generally, it would seem, construed in this sense."

which was cited with approval by Judge Soper, speaking for the Fourth Circuit in *United States v. Shafto*, 246 F. 2d 338, 342 (4th Cir. 1957). See also, 1 American Law of Property § 3.59 (A.J. Casner ed. 1952) at 307 and 32 Am. Jur. *Landlord and Tenant* § 92 (1941) at 101.

The court below rejected this argument and apparently concluded that when the Corporation assigned[4] a

---

4. Which by its terms sold, assigned, set over and delivered the lease,

"TOGETHER with the immediate and continuing right to collect and receive all of the rents, income, receipts, revenues, issues and profits now due or which may become due or to which Assignor may now or shall hereafter (including the period of redemption, if any) become entitled or may demand or claim, arising or issuing from or out of the said lease(s) or from or out of the said premises or any part thereof, *including but not by way of limitation: minimum rents, additional rents, percentage rents, parking maintenance, tax and insurance contributions, deficiency rents* and liquidated damages following default, the premium payable by any lessee upon the exercise of a cancellation privilege originally provided in any said lease, and all proceeds payable under any policy of insurance covering loss of rents resulting from untenantability caused by destruction or damage to the said premises *together with any and all rights and claims of any kind which Assignor may have against any lessee under such lease(s)* or any sub-tenants or occupants of the said premises (all such moneys, rights and claims in this paragraph described being hereinafter called 'rents'), EXCEPTING THEREFROM, any sums which by the express provisions of any said lease are payable directly to any governmental authority or to any other person, firm or corporation other than the lessor under the said lease; * * *" (emphasis added.)

lease, which embodied covenants imposing obligations on the tenant which went far beyond the duties found at common law or incorporated in a simple lease, the case was taken out of the general rule that only the rents were transferred. Support for such a view can be found in *Isman v. Hanscom*, 217 Pa. 133, 66 A. 329 (1907) which held that when a lessor assigned "all his 'right, title and interest in this lease and all benefit and advantages to be derived therefrom' ", there passed to the assignee of the lease the option of acquiring improvements placed on the premises by the lessee, originally reserved to the lessor by the terms of the lease. In *Taylor v. King Cole Theatres*, 183 Va. 117, 31 S.E.2d 260 (1944) an assignment of the landlords' right, title and interest in a lease was held to carry to the assignee the right to agree on renewal terms, a right reserved by the lease to the original lessors.

We do not reach this point, however, since under our view, the result reached below was surely compelled by another reason. It will be remembered that A.I.C.'s three year mortgage called for no payments in reduction of principal, and that the $500,000 loan which it secured became due and payable on 11 May 1967. Of the total rent payable by the Melnick Group, $73,000 per annum was available for the servicing of the A.I.C. mortgage. Since interest payments on that mortgage amounted to $50,000 each year, it is perfectly apparent that it was not the Melnick Group's default in the performance of the lease covenants which brought about the foreclosure of the A.I.C. mortgage, but rather the failure of the Partnership to repay the principal amount when it became due. In actual fact, A.I.C. could have commenced to foreclose at any time after 11 May 1967, and the foreclosure sale would not have been averted even if the Melnick Group had fully performed every lease covenant to the day of foreclosure.

*Order affirmed, costs to be paid*
*by appellant.*