ROBINSON ET AL. *v.* BRODSKY ET AL.

[No. 114, September Term, 1972.]

*Decided January 18, 1973.*

The cause was argued before BARNES, MCWILLIAMS, SINGLEY, SMITH and DIGGES, JJ.

*Andrew E. Greenwald,* with whom were *Karl G. Feissner, William L. Kaplan, Thomas P. Smith, Fred R. Joseph, Walter E. Laake, Jr.,* and *Feissner, Kaplan, Smith & Joseph* on the brief, for appellants.

*Brainard H. Warner, III,* with whom were *Kaslow & Warner* on the brief, for appellees.

MCWILLIAMS, J., delivered the opinion of the Court.

One might say with reasonable accuracy that *Penn Gardens Section Two v. Melnick,* 256 Md. 72, 259 A. 2d 520 (1969), was a harbinger of this case. If *Penn Gardens* presented, as it did, a tangled skein, then this dispute falls just short of being a veritable Gordian knot. The chancellor, Moore, J., like Alexander, cut through it all with an able and incisive opinion upon which we shall draw liberally and whose conclusions we shall affirm.

In November 1960 Brodsky, an employee of Robinson Land Brokers, Inc., and himself a licensed broker, negotiated the sale of 25 acres of land in Prince George's

County to one Bernard Katz and as a consequence he became entitled to a $9,000 commission. Some months later when appellants, Robinson and Melnick, bought Katz's interest in the contract of sale Brodsky became entitled to an additional $2,250. He was to receive his commissions when the closing took place in July 1961. He had been persuaded, however, by Robinson and Melnick to go along with them in the development of the land so they retained the money due him.

A month or so later Robinson, Melnick, Jerry Wolman and Nick Basiliko, contemplating the construction of about 550 apartments on the land, entered into the "Penn 500 Joint Venture Agreement." Each of them was allotted a 25 percent interest therein. Wolman and Basiliko agreed that Robinson and Melnick could assign their interests to a limited partnership they intended to form in which they (Robinson and Melnick) would be general partners.

A few weeks later the "Penn 500 Limited Partnership" was formed. The general partners named were Robinson and Melnick. The agreement provided that "all other parties [t]hereto . . . [would] be limited partners." Robinson and Melnick contributed their respective 25 percent interests in the "Penn 500 Joint Venture." They each took a 40 percent interest in the Limited Partnership. The balance (20 percent) was apportioned among 24 limited partners whose cash contributions amounted to a total of $140,000, or $7,000 for each of the 20 percentage points. Oxenburg became a limited partner. He paid $14,000 for a two percent interest. The agreement provided that a limited partner would not be liable for losses "in excess of the amount of his share of partnership capital."

Robinson and Melnick contributed additionally the principal and interest of deeds of trust ($270,000) which they had assumed in connection with the purchase of the land. Also they guaranteed the payment of interest at

six percent to the limited partners on the amount of their contributions.

Robinson and Melnick assigned to Brodsky, out of their 80 percent, a six percent interest in the partnership. The 80 percent was then held 37 percent by Robinson, 37 percent by Melnick, and six percent by Brodsky. They agreed also with Brodsky that he "would in no event be required to make any part of the payment of principal and interest on the deeds of trust ($270,000) and that the guaranty of interest to the limited partners would remain "strictly" their obligation.

About seven months later Brodsky, being in need of cash, sold to Oxenburg, for $14,000, one-third of the six percent interest he had acquired from Robinson and Melnick, both of whom consented to the sale. Oxenburg was now a $14,000 limited partner and a two percent general sub-partner. Brodsky's interest was reduced, correspondingly, to four percent. Oxenburg thought at the time, mistakenly of course, that he was increasing his interest as a limited partner.

The Joint Venture built 276 apartment units in Section 1 and 323 units in Section 2. Public response, alas, was considerably less than enthusiastic; so much so that in mid-1963 about one-third of the units were vacant. Efforts to find a buyer for the project were unsuccessful. Eventually a "sale and lease-back" arrangement was negotiated as a result of which the Limited Partnership realized proceeds slightly in excess of $465,000 in cash, $97,000 of which was distributable to the limited partners. The amount distributable to the general partners was $367,959.48. Oxenburg was paid his original contribution ($14,000), as were the other limited partners.

Neither Brodsky nor Oxenburg, however, was paid any part of the $367,959.48. Robinson and Melnick seem to have pocketed it but to what use it was put is not clear. There was testimony that they offered Brodsky $2,737.48, and that they offered Oxenburg $14,000 provided he could

persuade Brodsky to accept the $2,737.48 and sign a general release. Quite understandably Brodsky refused.

In August 1964 Brodsky and Oxenburg sued Robinson and Melnick. They claimed in their bill of complaint that they were limited partners and as such entitled to receive $28,000 and $14,000 respectively. Robinson and Melnick answered denying that Brodsky and Oxenburg were limited partners; they went on to allege they had sustained losses in excess of $250,000.

Judge Moore agreed that Brodsky and Oxenburg had not become limited partners but, as he said in his opinion of 29 May 1967, he found himself

" . . . drawn ineluctably to the conclusion that Robinson and Melnick on the one hand and Brodsky on the other, contemplated that Brodsky would 'ride' with his employers, taking a 6% . . . part of their 80% holding, without obligation on the part of Brodsky to contribute in cash to the known cash commitments of the general partners and without concern on the part of Brodsky for the management of the enterprise which, by the terms of the limited partnership articles annexed to his agreement, was reposed in his employers. In legal effect, therefore, a sub-partnership relationship between Robinson and Melnick and their employee Brodsky, came into being. . . . And upon this relationship, the fortunes of Brodsky (and of Oxenburg, by derivative right) in this enterprise rise or fall.

"The relationship between them, it must quickly be added, however, is a fiduciary relationship. Clearly, the Plaintiff Brodsky (and through him, the Plaintiff Oxenburg) were entitled to more than appears to have been forthcoming at the hands of Robinson and Melnick.

"For example (1) they were entitled to a pro rata distribution of cash (after reasonable

withholding for escrow purposes) at the time the sale-leaseback arrangements were finally consummated; (2) clearly, their participations are not to be reduced by the amounts voluntarily contributed, as a goodwill gesture, by the general partners to those named limited partners (over and above their pro rata distributions) who elected to withdraw; and (3) they are entitled to a full and faithful accounting of (a) the cash proceeds of the sale-leaseback arrangements and (b) of the profit and loss experience of the Joint Venture-Limited Partnership operation of the apartment properties since the inception of the leases.

"In this connection, the court concludes that . . . the partnership itself has not been terminated either in accordance with the partnership articles or by operation of law.

"Accordingly, the court will order that this matter be referred to one of the auditors of the court for the statement and settlement of an account between the parties in accordance with the findings of fact and conclusions of law above stated, upon the submission to the court of a proposed order by counsel, *final decision being reserved until further order of the court, pending the filing of said account.*" (Emphasis added.)

In his report, filed 18 November 1969, the auditor recommended to the court "that judgment be entered against the defendants" in favor of Brodsky for $16,574.47 and in favor of Oxenburg for $8,287.23. Robinson and Melnick filed exceptions and after a hearing Judge Moore, in March 1970, vacated the order of ratification and ordered the matter "rereferred to . . . [the] auditor for hearings and for [a] determination of the matters set forth in the findings of fact and conclusions of law heretofore filed on June 1, 1967."

On 30 September 1971 the auditor filed his supplemental report which, in part, is as follows:

"Subsequent to filing an Auditor's Report on November 18, 1969, your auditor held two extensive hearings, at which hearings the parties hereto and their respective counsel were in attendance. The additional evidence obtained as a result of the hearings aforesaid further substantiated the opinion of your auditor as noted in his previous report.

"It appears that one of the strong issues relied upon by the defendants was to the effect that the limited partnership had not been dissolved in 1964 but continued to operate for five years thereafter, and, accordingly, losses sustained during those five years would affect any distribution that might have accrued on behalf of . . . [Brodsky and Oxenburg]. This contention is spelled out . . . [in] the transcript of a hearing held on January 26, 1968 before . . . [Judge] Moore wherein Mr. Hilland, attorney for the defendants, stated that his clients were prepared to prove that the notation on the top of the 1964 tax return, "Final Return—Partnership Dissolved 11/30/64," was the accountant's error and that the partnership had not been dissolved. Evidence obtained at the two hearings held by your auditor showed that the partnership had been dissolved as of November 30, 1964, since no partnership returns for the later years were produced and further the testimony of the accountant for the defendant was to the effect that they couldn't find any returns and it must have been a mistake. As to the issue of the existence of a limited partnership, your auditor feels from the evidence that the limited partnership was dissolved November 30, 1964.

\* \* \*

"It is therefore the opinion of your auditor that judgment be entered against the defendants on behalf of . . . [Brodsky] in the amount of $16,574.47 and on behalf of . . . [Oxenburg] in the amount of $8,287.23. . . . ."

Exceptions to the Supplemental Report were filed and there was a further hearing before Judge Moore. In his opinion overruling the exceptions he said, in part:

"The auditor received extensive testimony in hearings before him on April 22 and May 1, 1970 at which times the depositions of . . . Robinson and Peter R. Bagatti (Controller) were taken. The total transcript includes 250 pages.

"Following the taking of this testimony the auditor filed a supplemental report dated September 30, 1971, adhering to his original recommendations based principally upon a finding that the limited partnership had in fact been dissolved. Upon this finding, the auditor concluded that there was no need for the stating of any account between the parties.

"The matter is again before the court on defendants' exceptions to the Auditor's Supplemental Report filed herein on October 13, 1971. A hearing in open court was held on said exceptions on December 17, 1971.

"The court has carefully reexamined its findings of fact and conclusions of law filed herein on June 1, 1967 and has also reviewed the papers filed subsequent thereto, has read the transcript of proceedings before the court on January 26, 1968 at the hearing on Plaintiff's motion for judgment and alternative relief and *has read the entire transcript of the testimony before the auditor.*

"In the proceedings before the auditor it has become abundantly clear that the limited partnership was in fact dissolved in November, 1964. The court's earlier statement (Order filed March 28, 1968) that the dissolution of the partnership 'was not dispositive of the matter' is not to be interpreted as a holding that the dissolution of the limited partnership was not a significant factor. Rather it was intended to signify that proceedings before the auditor were still required by the court.

"A reading of the transcript of proceedings before Mr. Dunphy [the auditor] convincingly demonstrates that the partnership dissolution did in fact occur in November, 1964, and it becomes quite apparent that there is no need for an adjustment of accounts between the limited partners notwithstanding the earnest argument to the contrary advanced by the defendants.

"It is by the court this 31st day of January, 1972, ORDERED, that the exceptions to the Supplemental Report of the Auditor be, and the same hereby are, overruled." (Emphasis added.)

On 24 February 1972 Judge Moore ordered the entry of a judgment in favor of Brodsky for $18,630.86 with interest from 30 November 1964, and a judgment in favor of Oxenburg for $9,315.43 with interest from the same date. It is from these judgments that Robinson and Melnick have appealed.

The appellants have striven mightily to persuade us that the auditor was both a fumbler and a dullard. They say his "purported findings" suggest a "misunderstanding of the issues," that they are not in conformity with the weight of the evidence, and that "as a matter of fact [they] are in complete disregard of most of it." They say he "erroneously presumed that the purported dissolution of the limited partnership . . . discharged any

and all liabilities of all parties . . . ." They say he not only misunderstood the evidence but that he "failed to consider relevant, pertinent and critical evidence." They charge him with non-compliance with the court's order. They insist he exceeded his authority and that he usurped the judicial function. We are neither impressed nor persuaded.

There is ample support in the evidence for the findings of the auditor as well as the chancellor's adoption and approval of his findings. The essential fact, indeed the keystone of the chancellor's ultimate conclusion, is that the partnership was dissolved on 30 November 1964. The evidence in support of this conclusion seems to us to be irrefutable. The tax return for the period beginning 1 January 1964 and ending 30 November 1964 is marked "Final Return—Partnership Dissolved 11/30/64." The appellants insist this return, signed by either Robinson or Melnick, was prepared and filed in error but no later returns were ever prepared or filed and it was the last return found in the records of the partnership. No books or records of the Limited Partnership have been kept since November 1964. The net proceeds from the sale were disbursed but, of course, no payments were made to Brodsky and Oxenburg.

The Limited Partnership Agreement provided that "upon the dissolution of the partnership" and after "paying all liabilities to creditors" the net proceeds shall be distributed "among the partners in proportion to their partnership interest." The auditor a number of times asked the question, "Who were the creditors [of the partnership] in May 1964 and how much was owed to them," but as appellees point out no credible evidence of debts or liabilities in May or November 1964 has ever been offered. Appellants have filled their brief with heart-rending lamentations about the losses they sustained in the operation of the Joint Venture after the "sale and lease-back" but that debacle is not before us. After the dissolution of the partnership, of necessity they chose to

continue as members of the "Penn 500 Joint Venture" and it is perhaps not unfair to say that from then on they felt they needed neither their limited partners nor their "sub-partners."

Appellants insist that the auditor is simply a calculator and an accountant for the court. He must shut his eyes, they seem to argue, to everything but the addition and subtraction of figures. They profess to see support for this notion in *Green v. Green*, 182 Md. 571, 35 A. 2d 238 (1944), but we think their perception is somewhat myopic. Judge Delaplaine did indeed say, in *Green*, that the auditor "is the calculator and accountant of the court" but he went on to say, for this Court:

> ". . . [W]hen any calculations or statements are required, all the pleadings, exhibits and proofs are referred to him, so that he will be enabled to *investigate the cause fully and put it in proper order* for the action of the Court." *Id.* 574. (Emphasis added.)

In *Townshend v. Duncan*, 2 Bland 45, 74 (1829) (decree reversed in *Robinson v. Townshend*, 3 G. & J. 413 (1831)), Chancellor Bland discussed in great detail the functions and duties of masters, auditors and examiners. He said:

> "The legislature of the republic [Acts of 1785, Ch. 72, § 17] has authorized the Chancellor to appoint, during his pleasure, a person of integrity, judgment and skill in accounts to be auditor for the Court of Chancery; and has also declared, that all accounts directed by the Chancellor to be stated, shall be referred for such purpose to the auditor, who shall have authority to administer an oath to all witnesses, and persons proper to be examined upon such account; and shall state such accounts agreeably to the order of the Chancellor, and return the

same, to be done with as the Chancellor shall think just.

"But there is nothing in that, or in any other legislative enactment which either expressly, or virtually withholds from the auditor any other authority which necessarily, or properly belongs to his office; or which abrogates any powers or duties which had been assigned to masters in Chancery, to commissioners to audit accounts, to an auditor, or to any other similar officer, whose assistance the Chancellor had found to be useful, or indispensably necessary to the proper exercise of his jurisdiction. Consequently, this legislative enactment, so far as it goes, can only be regarded as an affirmance of the pre-existing powers of the Chancellor. And this court has, in many cases, since the passage of that law, assumed the position, that it was in fact nothing more, so far as it went than an affirmance of its pre-existing powers; it has, where occasion required, issued a commission to audit accounts; it has referred cases to persons with directions to perform duties properly belonging to a master in chancery or auditor, considering them as *special auditors;* and it has, in various instances, treated the auditor as a standing officer of the court, clothed with powers analogous to those of a master in chancery in *England;* and with all such powers as had been formerly understood to belong to a master in chancery here.

"In fine, deeming it to be entirely within the legitimate scope of the auditor's powers to make any inquiry, to take testimony, to state any account, or to frame any statement which may be necessary or proper to enable the court correctly to dispose of any case in which it has the power to grant relief, I shall send this case to

the auditor, with such instructions accordingly."
2 Bland at 74-75.

Miller, *Equity Procedure* 632-33 (1897), says that while not in all respects the same, the office of auditor "is to a certain extent very analogous to a master in chancery." It is proper also, he says, "for an auditor to suggest to the court the propriety of suspending a claim for good reasons, or reserving a fund for a particular purpose, or *any other matter* that may aid the court in the settlement of the cause." (Emphasis added.) We have not found anything in the later cases [1] or in Code (1966 Repl. Vol.), Art. 16 or in Maryland Rule 595 that could be said to attenuate or circumscribe the functions of the auditor to the extent urged by the appellants.

We see no impropriety nor any suggestion of incompetence in the conduct of the auditor here. Indeed we think it would have been remiss of him had he failed to bring to Judge Moore's attention his findings and his belief in respect of the date of dissolution. But what completely settles our minds in this regard is the fact that Judge Moore made his own independent finding of fact; he did not accept on faith the contents of the auditor's supplemental report. He "carefully reexamined . . . [his earlier] findings of fact and conclusions of law." He reviewed the "papers filed subsequent thereto" and he read the transcript of the testimony he heard in January 1968. He "read the entire transcript of the testimony [250 pages] before the auditor" which he thought made "abundantly clear" the dissolution of the partnership in November 1964. His reading of that testimony, he said, "convincingly demonstrates that the partnership dissolution did in fact occur in November 1964 . . . ."

---

1. Arundel Asphalt Prods., Inc. v. Morrison-Johnson, Inc., 256 Md. 170, 259 A. 2d 789 (1969); Coppage v. Maryland Thrift Savings & Loan Co., 253 Md. 238, 252 A. 2d 869 (1969); Bris Realty Co. v. Phoenix Savings & Loan Ass'n, 238 Md. 84, 208 A. 2d 68 (1965); Pinkston, Tr. v. Higham, 224 Md. 513, 168 A. 2d 712 (1961); Maryland Lumber Co. v. White, 205 Md. 180, 107 A. 2d 73 (1954); Schwartzman v. Payne, 203 Md. 256, 100 A. 2d 23 (1953).

We see no merit in the appellants' penultimate argument that the order of 31 January 1972 overruling their exceptions to the auditor's supplemental report amounted to the granting of a summary judgment without notice. The "Final Return" was filed in these proceedings in September 1967. Appellees' counsel had just then learned of it and in a promptly filed motion for judgment asserted dissolution of the partnership. The motion was denied because the appellants said the return had been filed by mistake and that a new return would be filed, but as has been said, no such return or any subsequent returns were ever filed. The supplemental report was filed four years later. The appellants mounted a sharp attack on the report both in their exceptions and in the subsequent hearing before Judge Moore. It will be observed that although the order overruling the exceptions was dated and filed 31 January 1972 the order for judgment was not signed until 24 February; it was filed on 25 February. During the intervening 25 days the appellants did nothing, which suggests that the argument now made is an afterthought.

In conclusion appellants suggest it is somehow iniquitous for Brodsky and Oxenburg to obtain the relief granted while they suffer losses now in excess of $500,-000. They contend it violates the "Clean Hands Doctrine" but they do not support their contention either with logic or with authority. In any case we find it to be without merit.

Although it seems hardly necessary, we should observe that, in our judgment, Judge Moore's findings of fact were not clearly erroneous, Rule 886, nor do we think he has misapplied the law.

> *Judgments affirmed.*
> *Costs to be paid by the appellants.*