593 A.2d 684

**Tom J. BILLMAN, et al.**

v.

**STATE OF MARYLAND DEPOSIT INSURANCE
FUND CORPORATION, et al.**

**On Remand No. 96, Sept. Term, 1989.**

Court of Special Appeals of Maryland.

Aug. 8, 1991.

82

John R. Fornaciari (Robert E. Hebda, Robert M. Disch, Steele & Fornaciari and Eckert, Seamans, Cherin & Mellott, Washington, D.C., on the brief), for appellants, Billman, Crysopt Corporation, Epic Holdings Ltd. and Epicenter Consolidated, Ltd.

Clayton C. McCuistion, pro se.

Leonard Meltz, pro se.

Neil J. Dilloff (Jonathan D. Smith and Piper & Marbury, on the brief, J. Joseph Curran, Jr., Atty. Gen. and Dennis M. Sweeney, Deputy Atty. Gen. of counsel), Baltimore, Md., for appellees.

Argued before WILNER, C.J., FISCHER, J. and LAWRENCE F. RODOWSKY, Associate Judge of the Court of Appeals, Specially Assigned.

LAWRENCE F. RODOWSKY, Judge, Specially Assigned.

Appellee, State of Maryland Deposit Insurance Fund Corporation (MDIF), is the receiver of Community Savings & Loan, Inc. (CSL), a Maryland chartered, capital stock savings and loan corporation. In an action for damages based on breaches of the duties of loyalty and care owed to CSL by its officers and directors, MDIF obtained judgments, jointly and severally, against appellants, Tom J. Billman (Billman), Clayton C. McCuistion (McCuistion), and Leonard Meltz (Meltz), in excess of $112 million, against appellant, Crysopt Corporation (Crysopt), for approximately $94 million, and against two holding companies of CSL, which are also appellants, for $109 million.[1]

On an earlier consideration of this appeal, this court reversed the judgment and remanded for a new trial because documents which had not been admitted into evidence mistakenly had been delivered to the jury room where they were available to the jury during its deliberations. *Billman v. State of Maryland Deposit Ins. Fund Corp.*, 80 Md.App. 333, 563 A.2d 1110 (1989). Finding that the error was not prejudicial, in light of the record as a whole, the Court of Appeals reversed. *State of Maryland Deposit Ins. Fund Corp. v. Billman*, 321 Md. 3, 580 A.2d 1044 (1990). The appeals are now before this court on remand from the Court of Appeals for the purpose of considering the issues which were not decided in the prior opinions.

CSL was one among a myriad of corporations and partnerships affiliated with Equity Programs Investment Corporation (EPIC), a syndicator of tax shelter limited partnerships which invested in residential real estate. Billman was the founder of EPIC and a controlling principal in the EPIC group of corporations and partnerships. Crysopt is a holding company wholly owned by Billman.

---

**1.** The substantial briefs on this appeal are those filed on behalf of Billman and Crysopt. The remaining appellants have simply adopted those briefs.

Appellants claim that many errors were committed in the proceedings below. The nature of MDIF's claims and an outline of the proof supporting those claims may be found in the Court of Appeals opinion, *supra*. Throughout this opinion we shall set forth facts, additional to those found in the Court of Appeals opinion, to the extent necessary to present the issue under consideration and the grounds of its disposition.

## I

By a preliminary motion under Maryland Rule 2–322, Crysopt challenged personal jurisdiction. Crysopt, a Delaware corporation, maintained its principal business office in Alexandria, Virginia during the relevant period. The Circuit Court for Montgomery County denied the motion. Crysopt claims that was error.

Md.Code (1974, 1989 Repl.Vol.), § 6–103 of the Courts and Judicial Proceedings Article, the Maryland long arm statute, provides in relevant part as follows:

"(a) *Condition.*—If jurisdiction over a person is based solely upon this section, he may be sued only on a cause of action arising from any act enumerated in this section.

(b) *In general.*—A court may exercise personal jurisdiction over a person, who directly or by an agent:

. . . .

(3) Causes tortious injury in the State by an act or omission in the State[.]"

■ The breaches of fiduciary duty owed to CSL by the individual defendants in this case were torts. *See* Restatement (Second) of Torts § 874 (1977) ("One standing in a fiduciary relation with another is subject to liability to the other for harm resulting from a breach of duty imposed by the relation."). The theory of MDIF's complaint against Crysopt is that Crysopt "was among the means and instrumentalities by which" Billman and others committed the tort or series of torts. It was on that theory that the case went to the jury against Crysopt, and the verdicts against

Crysopt must be viewed as based on that theory. The tort victim, CSL, had its principal place of business in Montgomery County, Maryland.

Crysopt's role in the EPIC "reorganization" of February 28, 1985, sufficiently demonstrates that Crysopt caused tortious injury to CSL in Maryland. In summarizing that role we shall refer to the two tiers of holding companies of CSL collectively as "EPIC Holdings," as did the Court of Appeals. *Billman,* 321 Md. at 18, 580 A.2d 1044. Billman owned eighty percent of the stock of EPIC Holdings, and McCuistion owned twenty percent. In the reorganization Billman received assets valued in excess of $31 million, including all of the stock of Crysopt.

Between January 9 and February 25, 1985, CSL paid to EPIC Holdings $1.5 million in tax allocation payments and $7,999,998 in dividends. EPIC Holdings then utilized those payments when it infused $14 million of immediately available funds into Crysopt. Nearly $9 million of those funds were deposited to an account of Crysopt at CSL on February 19, 1985, which was drawn down to $63,000 by early March 1985. Parts of the tortious injury allegedly suffered by CSL were the tax allocation payments and the February 7, 1985, illegal dividend of $7,999,998.[2] Also included in the assets of Crysopt was the stock of Batts Neck Corporation, which, through a number of subsidiary corporations, owned valuable real estate on the Eastern Shore. The net worth of Batts Neck Corporation was $1.2 million. In addition to the $14 million in cash and the stock of Batts Neck Corporation, Crysopt had other assets valued at the time of the reorganization at $16.5 million.

Essentially, because Billman controlled Crysopt, Crysopt acted through Billman. There is no issue concerning Maryland's jurisdiction over Billman. When Billman utilized Crysopt in transactions which violated Billman's duties to

---

**2.** The fact that the jury found in favor of Crysopt on the claim for illegal dividends is immaterial to whether Maryland had jurisdiction to try the claim against Crysopt on that count.

CSL, Crysopt was acting in Maryland to the same extent that Billman was. The nexus here between the contacts supporting an exercise of personal jurisdiction and the nature of the action brought is extremely strong. *Cf. Camelback Ski Corp. v. Behning,* 307 Md. 270, 513 A.2d 874 (1986), *vacated and remanded,* 480 U.S. 901, 107 S.Ct. 1341, 94 L.Ed.2d 512 (1987), *on remand,* 312 Md. 330, 539 A.2d 1107, *cert. denied,* 488 U.S. 849, 109 S.Ct. 130, 102 L.Ed.2d 103 (1988). There was personal jurisdiction over Crysopt.

## II

Appellants contend that their "recoupment" counterclaims were improperly dismissed and that their "recoupment" defenses were improperly stricken. The argument is an effort to bring this case within the holding of *State v. Hogg,* 311 Md. 446, 535 A.2d 923 (1988). In *Hogg,* MDIF sued as successor to Maryland Savings–Share Insurance Corporation (MSSIC), the private insurer of deposits in Maryland chartered savings and loans. MSSIC had been statutorily merged into MDIF. *See* 1985 Maryland Laws (First Special Session), Ch. 6, uncodified § 4. The action was against former officers and directors of MSSIC. The *Hogg* opinion used the term, "recoupment," to describe the principle "that, by initiating an action for money damages, a sovereign who has not by statute consented to suit against it, consents to a reduction of its claim for any amount payable to the defendants by a private party in the position of the sovereign which arises out of the same transaction or occurrence sued upon." 311 Md. at 457, 535 A.2d 923. *Hogg* held that " 'recoupment[ ]' does not offend Maryland's sovereign immunity." *Id.*

The appeal in *Hogg* was noted by MDIF from the refusal by the trial court to strike the defendants' recoupment defense. That appeal was permitted only under the collateral order doctrine, thereby limiting the issue before the Court of Appeals to whether sovereign immunity would be infringed were the case to be tried with recoupment as a

viable defense. 311 Md. at 471 and n. 11, 535 A.2d 923. Thus, the *Hogg* Court had no occasion to consider whether any duty was owed to the defendants in *Hogg* by the State and its agencies there involved.

The matter now before us was tried on MDIF's second amended complaint. MDIF prosecuted the action as receiver of CSL. *See Billman,* 321 Md. at 5, 580 A.2d 1044. The theory of the complaint was that Billman and others caused loss to CSL by unlawful loans to EPIC entities (Count I), by unlawful loans to "Insider Partnerships," *i.e.,* those composed of officers and directors of EPIC affiliated entities, including most of the defendants (Count II), by unlawfully paying dividends (Count III), by unlawfully prepaying to EPIC Holdings moneys for taxes (Count IV), by unlawfully paying certain fees to related entities (Count V), and by certain acts of waste (Count VI).

Appellants filed counterclaims against MDIF, expressly including MDIF in its capacities as conservator and receiver of CSL, as regulator, as insurer, and as successor to MSSIC. The counterclaims also invoked Maryland Rule 2–331(c) in an attempt to join additional parties as counterclaim defendants. These were the Maryland Board of Savings and Loan Commissioners (Commissioners) and its Chairman, the Maryland Division of Savings and Loan Associations (DSL) and its Director, the Maryland Department of Licensing and Regulation and its Secretary, the Director of MDIF, and the Governor of Maryland. The theory of the counterclaims was that the counterclaim defendants owed duties, based in contract, general tort law, statutes, and constitutions, to the counterclaimants. The appellants' summary of the breaches of duty is that the counterclaim defendants "failed to ensure that other MSSIC S & L's were operated properly and failed to ensure that MSSIC had adequate funds to meet its insurance obligations; failed to use their resources to maintain public confidence in member S & L's and to absorb potential losses at Old Court; and caused the failure of public confidence which led to the run on deposits and the S & L [c]risis." Brief of Appellant

Billman at 20.[3] The appellants also filed answers denying MDIF's material allegations.

These allegations of the counterclaim, and the attempted joinder of additional parties, are simply attempts to sue the State in its various manifestations. The public officials are joined only in their official capacities, as a way of alleging wrong by the State. But appellants do not invoke any statutory waivers of sovereign immunity. Their argument rests on fitting their allegations into the recoupment concept.

Under *Hogg*, sovereign immunity is not infringed by a defense which was recognized at common law as a pure recoupment. *Hogg*, 311 Md. at 458, 535 A.2d 923, quoting from *State v. Baltimore & O.R.R.*, 34 Md. 344 (1871), *aff'd*, 21 Wall. 456, 22 L.Ed. 678 (1875), relied on the distinction between common law recoupment and statutory set off (a precursor of present Maryland Rule 2–331(a) and (c)).

■ Appellants' labeling of their pleading as a counterclaim is not determinative of the recoupment issue, so long as the substance of their allegations does not exceed common law recoupment. Here, appellants' allegations do not satisfy the requirements of common law recoupment. The defendants claim against MDIF as part of the State when MDIF is suing only in a representative capacity, as receiver of CSL, a private corporation. Further, appellants' claims rest on transactions and occurrences which are beyond those relied on in MDIF's complaint.

The distinction between set-off and recoupment in Maryland is described in W. Brantly's Notes to *Milburn v. Guyther*, 8 Gill 92 (1849). That annotator states in part:

"Set-off is distinguished from recoupment, in that while a set-off is in the nature of a cross suit, *ex dispari causa*,

---

3. "Old Court" is Old Court Savings & Loan Association, another state chartered savings and loan which failed during the crisis. For a description of the crisis see *Chevy Chase Savings & Loan, Inc. v. State,* 306 Md. 384, 509 A.2d 670 (1986) and W. Preston, *Report of the Special Counsel on the Savings and Loan Crisis* (1986).

is a remedy conferred by statute, and must be specially pleaded, a recoupment is a cross claim arising out of the same contract which forms the cause of action, (*ex eadem causa,*) is a common-law remedy, and need not be specially pleaded."

8 Gill at *93 (at reprint 69), note (b) (citations omitted). "Recoupment is a species of common law set off for damages due the defendant, growing out of the same transaction. It is allowed both in actions *ex contractu* and actions *ex delicto,* to avoid circuity of action. *Lee vs. Rutledge,* 51 Md. 318. The doctrine of recoupment is comparatively modern, but it has become the settled law of this State. *Warfield vs. Booth,* 33 Md. 72, 73. The tendency of modern decisions has been to avoid circuity and multiplicity of actions, by allowing matters growing out of the same transaction to be given in evidence by way of defence instead of requiring a cross-action, when it can be done without a violation of principle or great inconvenience in practice. *Ibid.* Matter of defence by recoupment is raised under the general issue by way of evidence and is not usually the subject of plea. 51 Md. 318."

8 Gill at *93 (at reprint 73).

Thus, common law recoupment is the most narrow of the concepts. It is embraced within the larger concept of set off, which in turn is embraced within the even more liberal scope of the claims permitted under Rule 2–331.

Purely defensive recoupment does not lie here because MDIF sued solely in a representative capacity, as the receiver of CSL. *See* 2 R. Clark, *The Law and Practice of Receivers* § 579 (3d ed. 1959). MDIF controlled CSL as receiver and brought this action in the right of CSL directly. The counterclaims which appellants assert as recoupment are not claims against MDIF in its representative capacity. They are not claims against CSL. The counterclaims assert MDIF's assumption of an alleged liability of MSSIC to the appellants and allege a failure by MDIF, as a state agency, and by other state agencies and officials to perform their

duties. But, "[a]n essential element of the doctrine of set-off [*i.e.*, recoupment] is that the cross claims or demands must be mutual and in the same right; that is to say, a claim held in a representative capacity cannot be set off against a personal debt of a representative, such as a trustee or an executor...." *Ghingher v. Fanseen,* 166 Md. 519, 527, 172 A. 75 (1934).

Analogous to the instant matter is *Coppage v. Maryland Thrift Sav. & Loan Co.,* 253 Md. 238, 252 A.2d 869 (1969). A private insurer of accounts in thrift associations had loaned money to Maryland Thrift. Both were later placed in receivership. The insurer, through its receiver, claimed the balance due on the loan. The receiver for Maryland Thrift was authorized by court order to claim on behalf of Maryland Thrift's depositors against the insurer for losses on the depositors' accounts. Maryland Thrift's receiver attempted to set off against the association's loan balance due to the insurer the amounts due by the insurer for deposit account losses. The Court of Appeals held that there could be no set off because the court order did not make the debts mutual. 253 Md. at 253, 252 A.2d 869. *See also McPherson v. Ross,* 1 Md. 181 (1853).

Under Fed.R.Civ.P. 13 "[t]he general rule seems to be that in an action brought in a representative capacity, defendant cannot assert a counterclaim against plaintiff in his individual capacity because it would not be a counter-claim against an 'opposing party.'" 6 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 1404, at 19 (1990) (footnote omitted).

The difficulty which appellants here encounter in asserting recoupment was not presented (or discussed) in *Hogg.* There the State, through MDIF, sued as the successor by merger to MSSIC, asserting breaches of the duties owed by the defendant officers and directors of MSSIC to MSSIC. In essence, the State, through MDIF, had gone into the business of insuring accounts, MDIF was suing in MDIF's own corporate capacity, as MDIF, and MDIF's standing in

the *Hogg* litigation was not representative, *i.e.*, MDIF was not suing as the receiver of MSSIC.

Another deficiency in appellants' reliance on recoupment is that appellants' claims rest on occurrences and transactions which go well beyond the breaches of duty to CSL by the defendants in the instant matter. In substance, appellants' claim embraces the entire savings and loan crisis. The claim embraces all of the relationships and activities between MSSIC, the state regulators, and other large, state chartered associations which were ultimately placed in receivership. *Hogg* pointed out that the scope of what may be raised by recoupment is determined by the complaint. 311 Md. at 465–66, 535 A.2d 923. The complaint in the instant matter is limited to the relationship between the defendants and CSL. The instant matter is unlike *Hogg* where the activities of MSSIC blanketed the industry of state chartered associations. That enabled the officers and directors of MSSIC, when sued with respect to activities pertaining to the entire industry, in turn to assert against the State, as plaintiff, alleged deficiencies of the state regulators relating to the entire industry.

Even if the agencies and individuals whom the appellants sought to join in their counterclaim are to be treated as separate from the State, or from MDIF, and even if Md. Rule 2–331(a) can be used to assert recoupment, with additional parties joined per Rule 2–331(c), it was nevertheless proper for the circuit court to strike the appellants' counterclaims. Because recoupment did not lie against MDIF in its representative capacity, the "recoupment" counterclaim did not lie. Absent a cognizable counterclaim against an original party to the action, Rule 2–331 does not provide for the joinder of additional parties as counterclaim defendants.

For the same reason appellants' derivative suit theory fails. Under that theory the counterclaim would be viewed as brought by appellants as shareholders of CSL, in the right of CSL, without the need for any demand on CSL, then under the control of MDIF, and against third parties (MDIF as insurer and other state agencies and officials)

who had injured CSL. But under that theory there still is no cognizable recoupment against MDIF as receiver of CSL.

### III

A lack of standing in MDIF to sue for some $38 million of the damages awarded is also asserted by appellants. This argument moves from the macroscale of issue II to the microscale of distinguishing between CSL and its direct and indirect subsidiaries. For example, unpaid loans to insider partnerships, on which the approximately $8 million verdict on Count II was predicated, were carried on the books of EPIC, a CSL subsidiary, and not directly on those of CSL. Similarly, tax allocation payments which underlay part of the verdict on Count IV were paid by CSL subsidiaries to EPIC Holdings. Appellants contend that this means that the damages were awarded to CSL for harm to subsidiaries of CSL, not to CSL itself.

In their brief-in-chief appellants rely on the common law principle, illustrated by *Waller v. Waller*, 187 Md. 185, 189, 49 A.2d 449 (1946), "that an action at law to recover damages for an injury to a corporation can be brought only in the name of the corporation itself acting through its directors, and not by an individual stockholder though the injury may incidentally result in diminishing or destroying the value of the stock."

MDIF points out that the rule relied upon is changed by statute. Md.Code (1980, 1986 Repl.Vol.), § 9–702(b) of the Financial Institutions Article (FI) recognizes that the conservator of a savings and loan association exercises "the powers granted by order of the court." FI § 9–708(c)(3) provides that the receiver of such an association has "[a]ny other powers and authority as may be expressed in the order of any court of competent jurisdiction." In the instant matter, the order appointing MDIF as conservator for CSL provided that "the conservator shall exercise all powers, rights and privileges of [CSL] and its subsidiaries, and shall conduct the operations of [CSL] and its subsidiaries."

The order appointing MDIF as receiver of CSL provided that the receiver succeeded to all interests of the conservator.

The circuit court's use of the above-quoted provisions of FI §§ 9–702(b) and 9–708(c)(3) is consistent with the reason underlying the common law rule applied in *Waller*.

"The reason for this rule is that the cause of action for injury to the property of a corporation or for impairment or destruction of its business is in the corporation, and such an injury, although it may diminish the value of the capital stock, is not primarily or necessarily a damage to the stockholder, and hence the stockholder's derivative right can be asserted only through the corporation. The rule is advantageous not only because it avoids a multiplicity of suits by the various stockholders, but also because any damages so recovered will be available for the payment of debts of the corporation, and, if any surplus remains, for distribution to the stockholders in proportion to the number of shares held by each."

*Waller v. Waller,* 187 Md. at 189–90, 49 A.2d 449. That is precisely what happens in the receivership of CSL.

In their reply brief appellants reject MDIF's response as immaterial. They say that "[t]he authority to bring a derivative action does not mean that the suit, as instituted, was in fact properly brought as a derivative action." Reply Brief of Crysopt at 2.

■ Thus, this issue reduces to a matter of pleading. Even if the proof of damages demonstrated harm to a subsidiary and not to CSL, MDIF was substantively authorized to sue as representative of subsidiaries of CSL. Appellants do not argue that they have been improperly prejudiced by the admission of the damage proof in the absence of allegations in MDIF's complaint that it also sued as representative of CSL subsidiaries. This deficiency, if any, is not a ground for reversal. Maryland Rule 2–341(c) provides that "[e]rrors or defects in a pleading not correct-

ed.by an amendment shall be disregarded unless they affect the substantial rights of the parties."

## IV

Appellants also claim error in the trial court's ruling and subsequent jury instructions concerning a so-called "federal tie-in" statute. This issue involves construing the statute dealing with authorized investments of savings and loan associations as that statute stood from July 1, 1983, through June 30, 1985. The statute involved was Md.Code (1980, 1983 Cum.Supp.), FI § 9–419(c). Appellants assert, and MDIF denies, that subsection (c) superseded regulations of the Commissioners which (1) established a loan to value ratio of ninety percent for mortgage loans secured by non-owner occupied residences, and (2) required that mortgages on owner-occupied residences comprise at least fifty percent of a Maryland association's assets. *See* Md.Regs. Code tit. 9, § 05.01.30C(13) and .30D(1) (1980). The jury instructions rejected appellants' construction. Analysis of the parties' arguments requires consideration of other subsections of § 9–419, from time to time, and of other sections of the Financial Institutions Article.

At all times relevant to the problem the Commissioners had authority to "adopt rules and regulations to carry out the provisions of [the Financial Institutions Article] that relate to savings and loan associations." FI § 8–207(b)(1). Throughout the relevant period, and until repealed by Chapter 282 of the Acts of 1986, FI § 9–419.1 provided that, "[i]n its investments under § 9–419 [an] association shall give priority to first mortgages for owner-occupied residences in the State." Also throughout the relevant period FI § 9–419 contained the following introductory language:

"(a) *Investments enumerated.*—Subject to the regulations of the Board of Commissioners, a savings and loan association may invest in any of the following types of investments[.]"

There followed a listing comprising twenty subparagraphs. Prior to July 1, 1983, that is, as amended through Chapters 796 and 819 of the Acts of 1982, the relevant subparagraphs read:

"(10) Deposits in or obligations of any bank insured by the Federal Deposit Insurance Corporation;

(11) Deposits in or obligations of:

(i) Any insured financial institution of this State; or

(ii) Any insured financial institution of any state, after the investing savings and loan association has total deposits in all branches which exceed an amount equal to $100,000 times the number of chartered savings and loan associations in the State;

. . . .

(19) Any investment permitted to a banking institution in this State provided that the savings and loan association meets the conditions required of an investing banking institution; and

(20) Any other investment authorized by the Board of Commissioners."

Subsection (b) of FI § 9–419 simply provides that associations "may accept any additional security on any investment authorized by [§ 9–419]."

At the 1983 session of the General Assembly, House Bill 284, a departmental bill of the Department of Licensing and Regulation, was introduced to repeal subparagraph (11) and enact a new subparagraph permitting an association to invest in "deposits in any other financial institution, provided the deposits are insured by" one of five types of insurers.[4]

---

**4.** These insurers were (1) the Federal Savings and Loan Insurance Corporation, (2) the Maryland Savings–Share Insurance Corporation, (3) "any other insurer under a state insurance program provided that the insurer is a member of the National Association of State Savings Insurers," (4) the Maryland Credit Union Insurance Corporation, or (5) the National Credit Union Share Insurance Fund. H.B. 284 (1983).

House Bill 284 was assigned to the Economic Matters Committee where it was amended. The proviso that "the deposits are insured" was changed to read, "provided each deposit is insured." Absent any further changes in the bill, this change would have eliminated an argument, based on ambiguity, that, by having some form of insurance on accounts a depository qualified under House Bill 284, even if the total deposits of the depositor association were not fully insured there. Instead, each deposit of the depositing Maryland association would have to be insured.

After passage by the House, the bill was referred to the Senate Economic Affairs Committee where a Maryland association proposed a further amendment.[5] At that time a proposed regulation pending before the Federal Home Loan Bank Board (FHLBB) would have allowed federal institutions to invest unlimited amounts in insured institutions. In order to achieve investment parity with federal associations under the anticipated regulation, by allowing state associations to obtain the higher interest rates available on short-term deposits in excess of $100,000, the association submitted the following language to be added at the end of proposed new subparagraph (11) of FI § 9–419(a):

"And provided further that this subsection shall not prohibit a state-chartered savings and loan association from making any investment that is permissible for a federal savings and loan association."

The Senate Committee, however, reported House Bill 284 with an amendment which, while basically tracking the language proposed by the association to the Senate Committee, placed the language in a new subsection (c) to § 9–419, reading:

"This section does not prohibit a State-chartered savings and loan association from making any investment that is permissible for a federal savings and loan association."

---

5. See materials on file with the Department of Legislative Services.

3 Md.Sen.J. at 2151 (1983). The House concurred in the Senate amendment, and the bill was enacted as Chapter 678 of the Acts of 1983.

The parties to the action now before us agree that the FHLBB never adopted the proposed regulation that had been under consideration while Chapter 678 was being enacted. They further agree that federal regulations, at least under certain circumstances, permitted a loan to value ratio of ninety-five percent on federal association first mortgage loans on non-owner occupied residences, and that there was no federal regulation establishing a minimum percentage of assets required to be invested in first mortgage loans on owner-occupied residences.

In a July 1984 memorandum to a legislative task force, the director of DSL said in part as follows:

"Whereas the investments under [FI § 9-419(a) ] are subject to rules and regulations of the Board of Commissioners, the authority to make investments the same as federal associations was done by adding Section 9-419(c) which gives the associations blanket authority to make investments the same as federal associations but not under the jurisdiction of the Board of Commissioners. We would like to see the authority to make investments the same as federal associations moved to Section 9-419(a) so that the Board of Commissioners would have control of these investments."

Almost immediately thereafter, however, in a letter opinion of August 3, 1984, from the offices of the Attorney General of Maryland, the deputy counsel of the Department of Licensing and Regulation together with the chief of the Antitrust Division advised the Commissioners that Chapter 678 did not abrogate the power of the Commissioners (1) to establish lower loan to value ratios than those applicable to federal associations and (2) to set minimum requirements for categories of assets. That opinion recognized that a court might construe Chapter 678 differently and urged clarifying legislative action.

By letter of September 24, 1984, outside counsel advised the in house counsel of EPIC that the General Assembly's "purpose in adopting a federal tie-in for investments was to maintain 'competitive equality' with federal associations." Because "Maryland's more restrictive loan-to-value ratio requirements can impair a Maryland chartered institution's ability to compete for loans with federally chartered institutions in a deregulated environment," and because the "more restrictive percentage of assets investment limitations ... impair a Maryland chartered thrift's ability to diversify so as to be able to survive and compete in an environment of volatile interest rates," the private opinion to EPIC concluded that the Commissioners' regulations, described above, were superseded. Counsel to EPIC also recognized that the state regulators would likely have a contrary opinion. In the case before us appellants' position is essentially that embodied in the opinion to EPIC.

The General Assembly again addressed the subject by Chapter 134 of the Acts of 1985. The title to that bill in part provides that it is "FOR the purpose of clarifying and making express the legislative intent that the ... Commissioners may impose reasonable limitations on certain business practices of the savings and loan industry under certain conditions...." Chapter 134 amended FI § 8–207 to provide in new subsection (b)(2) as follows:

"Except as otherwise provided in this title and in title 9 of this article and to the extent required to promote and assure the business and financial stability of savings and loan associations, the rules and regulations adopted by the Board of Commissioners under this section may include reasonable requirements and limitations on the types and amounts of investments, the manner of raising capital, and the nature and amounts of reserves, irrespective of their effects on free economic competition."

The bill further amended FI § 9–419. Subparagraph (a)(10) was changed to authorize "[d]eposits in any financial institution insured by [the FDIC or the FSLIC] to the same extent and subject to the same conditions as a federal

savings and loan association." FI § 9–419(c) was amended to read:

"This section does not prohibit a State-chartered savings and loan association from making any *additional* investment *other than those authorized in subsection (a)* of this section that is permissible for a federal savings and loan association to the same extent and subject to the same conditions as a federal savings and loan association."

(Emphasis added). These 1985 amendments unmistakably articulate the same position, as to regulatory power, taken under the 1983 statute by the Attorney General's staff. Within that context, these amendments confine the scope of the changes to that sought by the amendment tendered to the Senate in 1983 by a state association.

In the case before us, the essence of appellants' position is that, during 1983–1985, subsection (c) injected an overriding principle into Maryland's regulation of state associations, namely, that "any" investment permissible for a federal association was permissible for a state association. MDIF's and the Attorney General's interpretation is that investments permissible for federal associations became investments authorized for state associations, in addition to those enumerated in subsection (a), but that the additional types of investments were subject to limitations or other restraints by regulation of the Commissioners.

We adopt MDIF's construction. First, it is consistent with the legislative history which limits the purpose of the 1983 changes to obtaining parity with federal associations only in short-term deposits, as opposed to a purpose of achieving extensive deregulation as argued by appellants. Secondly, MDIF's construction avoids massive repeals by implication of other provisions of the Financial Institutions Article which appellants' construction requires.

It is noteworthy that § 9–419(a) does not expressly prohibit investments which are not expressly authorized by subsection (a). It affirmatively authorizes certain invest-

ments. There is, however, an implication that that which is unauthorized is prohibited. Thus, depending on the interpretation of subsection (a), the 1983 version of subsection (c) either expanded the types of expressly authorized investments, or rejected the implied prohibition with respect to expressly approved investments for federal associations. In either event, however, investments of the type permissible for federal associations, when made by a state association, remained subject to regulations of the Commissioners. Otherwise, the conferral by FI § 8–207(b)(1) of authority on the Commissioners to make rules and regulations is rendered largely nugatory, because appellants' position gives primacy to federal regulations, both as to type and extent of investment.

Further, appellants' interpretation reaches the extreme of concluding that, where there was no federal prohibition of any kind, subsection (c) of 1983 was intended to prevent state rulemaking. In other words, because there is no federal requirement dealing with the percentage of the investment portfolio which must be maintained in mortgages on owner-occupied residences, appellants conclude that Maryland's requirement to that effect is abrogated. That would mean that a Maryland association need not maintain any portion of its portfolio in mortgages on owner-occupied residences. Yet, that cannot have been the legislative intent in enacting subsection (c) because the General Assembly left intact § 9–419.1 requiring state associations to "give priority to first mortgages for owner-occupied residences in the State." MDIF's interpretation, and that applied by the trial court in this case in its instructions, is more consistent with the statutory scheme as a whole than is the radical departure therefrom advocated by appellants.

■ The 1985 clarifying amendments to FI § 9–419(c) and to related provisions confirm this construction of the 1983 enactment. Of course, "[a] subsequent legislative construction of the meaning of a prior statute is not binding or controlling on the Court...." *A.G. Crunkleton Elec. Co. v. Barkdoll*, 227 Md. 364, 369, 177 A.2d 252 (1962)

(citations omitted). "An effort to clarify statutory language so as to avoid the recurrence of a question and to settle it one way or the other does not necessarily establish the meaning of the language sought to be clarified." *Congressional School of Aeronautics, Inc. v. State Roads Comm'n*, 218 Md. 236, 253, 146 A.2d 558 (1958). Nevertheless, "a subsequent 'statute purporting to declare the intent of an earlier one might be of great weight in assisting a court when in doubt.'" *Swarthmore Co. v. Comptroller*, 38 Md.App. 366, 373, 381 A.2d 27 (1977) (quoting *United States v. Stafoff*, 260 U.S. 477, 480, 43 S.Ct. 197, 199, 67 L.Ed. 358, 361 (1923)). And *see Brafman v. State*, 38 Md.App. 465, 469, 381 A.2d 687 (1978). To the extent that ambiguity in the 1983 legislation raises any doubt as to its proper construction, the doubt is removed by the clarification in the 1985 legislation. Thus, the trial court did not err in its instructions dealing with the duty of the officers and directors of CSL to comply with the Commissioners' regulations.

V

Appellants challenge certain of the trial court's instructions to the jury.

After giving instructions applicable to jury trials generally, the court read verbatim Md.Code (1975, 1985 Repl.Vol.), § 2–405.1 of the Corporations and Associations Article (CA). That statute embodies the business judgment rule in Maryland. It provides that a director shall perform the duties of that position in good faith, with reasonable belief that the performance is in the best interest of the corporation, and "[w]ith the care that an ordinarily prudent person *in a like position* would use under similar circumstances." CA § 2–405.1(a)(3) (emphasis added). The jury was then told, in the language of subsection (b), that a director may rely on information and opinion presented by others, particularly by professionals as to matters reasonably believed to be within the professional's expert competence.

After instructing that the case involved duties both of care and of loyalty, the court defined the duty of care, again substantially in the language of CA § 2–405.1(a). Due care, the court then said, required management of the "institution's property with the same degree of care that [the officers and directors] would use to manage their own property." They need avoid gross negligence and should diligently abide by prudent business practices and applicable laws and regulations. The jury was also told the following:

"In the context of a savings and loan, the directors and officers owe a higher duty of care than is owed by their counterparts in a general corporation. This is because they are entrusted with funds belonging to the general public.

"Directors and officers of a savings and loan may be held liable if they acted with gross negligence and that negligence was the proximate cause of damage to the savings and loan.

"Gross negligence can be defined as a failure to perform a duty, with reckless disregard for the consequences."

The court then described the duty of loyalty and, thereafter, the effect of violations of law in making loans. The jurors were instructed that the latter was evidence of negligence, but that it was "up to [the jurors] to determine whether or not the negligence in this case amounts to gross negligence as I defined it for you."

### A

■ The appellants contend that it was error to refer to a higher duty of care owed by the officers and directors of a savings and loan than by those of a general corporation. In the context of the instructions as a whole there was no error, and certainly no reversible error. The court first had given a general instruction that the standard of care was that which "ordinarily prudent persons in a like position

would use under similar circumstances." In the challenged portion the court made the instruction somewhat more specific by focusing on the circumstance applicable to officers and directors of savings and loans—investing the savings of others.

The instruction is supported by a number of judicial decisions. In *Atherton v. Anderson,* 99 F.2d 883 (6th Cir.1938), an action by the receiver of a national bank against its directors, the court said:

> "[T]he directors are required ... to use ordinary diligence; and by ordinary diligence is meant, that degree of care demanded by the circumstances.... They must keep in mind that a national bank is not a private corporation in which stockholders alone are interested.... [O]ne of its principal purposes among others is to hold and safekeep the money of its depositors."

*Id.* at 888. And *see First Nat'l Bank of La Marque v. Smith,* 436 F.Supp. 824, 831 (D.C.S.D.Tex.1977), *modified on other grounds,* 610 F.2d 1258 (1980); *Gadd v. Pearson,* 351 F.Supp. 895, 903 (D.C.M.D.Fla.1972); *Litwin v. Allen,* 25 N.Y.S.2d 667, 678 (1940); *Broderick v. Marcus,* 152 Misc. 413, 272 N.Y.S. 455, 461 (1934). *See also* 1 *Michie on Banks and Banking,* Ch. 3, § 20, at 419 (1986 Repl.Vol.).

W. Keeton, *Prosser and Keeton on the Law of Torts* (5th ed. 1984) discusses comparative degrees of care, using as an illustration the common carrier's "highest" degree of care.

> "Although the language used by the courts sometimes seems to indicate that a special standard is being applied, it would appear that none of these cases should logically call for any departure from the usual formula. What is required is merely the conduct of the reasonable person of ordinary prudence under the circumstances, and the greater danger, or the greater responsibility, is merely one of the circumstances, demanding only an increased amount of care.

> "... There is seldom reason to think that [the courts] mean to say anything more than that greater or less care will be required under the circumstances. Yet the 'high

degree' instruction is unlikely ever really to mislead the jury...."

*Id.*, § 34, at 209 (footnotes omitted).

The challenged instruction correctly advised that compliance with the standard of care for officers and directors of a banking institution should be determined by comparison to the care exercised by the officers and directors of that type of enterprise. That includes responsibility for the savings of others.

## B

■ The circuit court refused to give two of the appellants' proposed instructions on the business judgment rule. We find no error in either refusal. The more basic of the requested instructions would have told the jury that directors had no liability to the corporation for an honest mistake of judgment "even though the errors may be so gross that they may demonstrate the unfitness of the directors to manage the corporate affairs." The instruction is contrary to Maryland law. There is liability for gross negligence in exercising business judgment. *See Parish v. Maryland & Virginia Milk Producers Ass'n*, 250 Md. 24, 74–76, 242 A.2d 512 (1968). The second requested instruction incorporated the first and would have applied the first specifically to the making of loans.

## C

■ The trial court submitted to the jury the issue of whether or not the savings and loan crisis was a superseding cause of the losses which MDIF attributed to the acts and omissions of the defendants. Appellants complain that this issue was not submitted on their requested instruction which purported to present the rule of causation applied in *Walker v. Vail*, 203 Md. 321, 328, 101 A.2d 201 (1953) ("[W]here either of two causes results in injury, for only one of which a defendant is responsible, and there is no basis for concluding that that was the cause rather than the

other for which the defendant is not responsible, no recovery can be had."). The appellants' requested instruction, however, would have told the jury that the quoted rule could be applied "[e]ven if defendants' acts may have caused plaintiffs' injuries[.]" The requested instruction contradicted the rule of Maryland law embraced in the balance of the request, and was properly refused.

## D

Appellants also claim that the court erred in the instruction concerning the burden of proof on breaches of the duty of loyalty. In a lengthy conference on proposed instructions, defendants took the position that, if a transaction between CSL and an officer or director were fully disclosed to the board, and if that transaction were approved by the affirmative vote of a majority of the disinterested directors, plaintiff had the burden of proving that the transaction was not fair and reasonable. The defendants relied on CA § 2–419 and on *Sullivan v. Easco Corp.*, 656 F.Supp. 531 (D.Md.1987). CA § 2–419(a) provides that transactions between a corporation and any of its directors are not void or voidable if there is compliance with subsection (b). Under subsection (b) there are alternative forms of compliance, (1) disclosure with ratification by disinterested directors or by stockholders, or (2) "[t]he contract or transaction is fair and reasonable to the corporation." CA § 2–419(b)(2).

In that conference on prayers the plaintiff took the position that *Easco Corp.* was not on point because it involved an ordinary business corporation. MDIF said that Md.Code (1980), FI §§ 9–307 and 9–323 controlled because they set forth more specific requirements directed at conflicts of interests of savings and loan association officials.[6] MDIF argued that the burden of proof remained on the defendants to prove that the transaction was fair and reasonable,

---

**6.** Md.Code (1980), FI §§ 9–307 and 9–323 were repealed by Chapter 282 of the Acts of 1986.

even if a majority of disinterested directors approved the same after full disclosure.

The instructions as given told the jury that the burden was on the person with a conflict of interests to prove disclosure to the board and approval of the transaction by a majority of disinterested directors. Further, "[i]f the interested person cannot show such approval, then that person must prove that the transaction was fair and reasonable to the corporation." This instruction is consistent with that sought by the defendants in the conference on prayers.

The court then instructed on former FI § 9–307, which deals with loans by an association to interested persons, and the court furnished the jury with a copy of that statute.[7] Appellants do not complain about the FI § 9–307 portion of the instruction. FI § 9–307 clearly applied to the loans to the insider partnerships.

The court then instructed that "[i]f under the circumstances the interested person cannot convince you ... that the transaction was fair and reasonable, then you may find that person liable." Further along the court said: "As I instructed you earlier ... the burden is on those defendants ... to whom you find these [voidable transactions] to be applicable, to prove that they are fair and reasonable to the corporation."

 This case illustrates the wisdom of the requirement of Rule 2–520(e), under which "[n]o party may assign as

---

7. Md.Code (1980), FI § 9–307 provided in relevant part:
 "(b) *Exceptions to prohibition.*—A loan is not prohibited by subsection (a) of this section if the loan is:
 (1) Secured by the borrower's:
 (i) Principal residence; or
 (ii) Savings accounts in the association, provided that a loan secured by a savings account may not be more than the withdrawal value of the account; or
 (2)(i) Approved by a two-thirds vote of the board of directors, any interested director taking no part in the vote;
 (ii) Approved by the Division Director; and
 (iii) Secured by collateral appraised by a disinterested appraiser approved by the Division Director."

error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection." Here, appellants did not take distinct exceptions to the instructions as they had been given. With the full encouragement of the trial judge, the parties relied on the extended colloquy in the pre-instruction conference. The two passages quoted above could have been intended, and understood, to have said no more than the initial statement of the instruction. That statement gave only the negative side of what the defendant sought. Any objection based on ambiguity of the two later references, or based on incompleteness of the initial statement, was not preserved.

Further, in their briefs appellants have narrowed the assertion of error to its effect on MDIF's claim for illegal dividends, pointing out that former FI § 9–307 was limited to loan transactions. Once again, the issue has not been preserved because, neither in the pre-instruction conference, nor in exceptions taken after the jury had been charged, did appellants ask the court to distinguish in the burden of proof instruction between the various claims of the plaintiff.

Finally, even if the point has been preserved, there is no error with respect to the illegal dividend claim because the governing provisions are the more particular ones of former FI § 9–323 set forth below. All appellants, other than Crysopt, were held liable on Count III (unlawful dividends) and for the same amount of damages as was Billman.[8] As to Billman's co-defendants the theory for an amount of liability in excess of any dividends received by a particular co-defendant was that that party acted jointly with Billman. Consequently, if the duty of loyalty instruction was not erroneous as to Billman, it was not erroneous as to those who acted jointly with him.

---

**8.** The jury found in favor of Crysopt on Count III.

Under the evidence most favorable to Billman certain "approvals" of the dividends by "independent" directors antedated the dividends and would have been granted when Billman held eighty percent of the stock of EPIC Holdings. Thus, Billman was a "controlling person" of CSL, as defined in FI § 9–323(a). Under FI § 9–323(d)(1)

"[a] controlling person may engage in a business or transaction with a capital stock association only if:

(i) A full disclosure of the business or transaction and the nature of the controlling person's interest is made to the board of directors of the capital stock association;

(ii) The transaction is approved in good faith by the recorded vote of the present and voting disinterested directors of the association; and

(iii) Any profits of the controlling person are not at the expense of the capital stock association and do not prejudice its best interests."

In order to satisfy FI § 9–323(d)(1), Billman had to prove under subparagraph (iii) that the dividend transaction was, in essence, fair and reasonable to CSL, even if the dividend had been approved by a majority of disinterested directors, after full disclosure, in conformity with subparagraphs (i) and (ii).

Appellants' argument derived from *Easco* rests on the alternative methods of complying with CA § 2–419(b). That analysis has no application to FI § 9–323(d)(1) which has three requirements. Accordingly, there was no error, even if the instruction put the burden on the defendants to prove the fairness of the dividends.

## VI

We next consider claims of error in rulings on the evidence, but only to the extent preserved for review.

## A

Bruce McPherson (McPherson), a consultant for MDIF as receiver of CSL, who was accepted as an expert in financial

analysis, opined, over general objection, that "in view of the extraordinary commitment of capital to the EPIC enterprises and in view of the total lack of documentation ... the level of negligence [of the individual defendants] is extraordinarily high." In their brief appellants specify that the error was in allowing "MDIF's witnesses to usurp the province of the jury" which "alone [was] to determine whether defendants' conduct constituted gross negligence...." Brief of Appellant Crysopt at 13–14.

 As noted above, the court did instruct that the jury was to decide for itself whether any negligence shown by the evidence constituted gross negligence. *See* Part V.A., *supra*. Further, the standard for admissibility of relevant opinion evidence is whether the trier of fact will receive appreciable help from it. *See Consolidated Mechanical Contractors, Inc. v. Ball*, 263 Md. 328, 338, 283 A.2d 154 (1971). An expert's opinion is not *per se* inadmissible because it is expressed in terms of an ultimate factual issue in the case. *See Simmons v. State*, 313 Md. 33, 42, 542 A.2d 1258 (1988); *Cider Barrel Mobile Homes Corp. v. Eader*, 287 Md. 571, 584, 414 A.2d 1246 (1980). Here, the evidence underlying the ultimate factual issue of the defendant's lack of care involved the operations of a multi-million dollar financial institution. That subject matter was not within the experience of average jurors, so that the trial court did not abuse its discretion in concluding that expert opinion on the ultimate factual issue would be of help to the jurors.

 John Wright (Wright) was an expert called by MDIF to testify on the responsibilities of officers and directors in financial institutions. He opined, over general objection, that the loans to EPIC entities were "terribly inappropriate," that the loan administration was "[u]nbelievably bad," that the loans to insider partnerships "never should have been made," that the dividends were "far in excess of anything that would be reasonable," that the tax allocation payments were "very harmful," and that the fees

for management services were "vastly in excess of what good was provided." For the same reasons stated above with respect to McPherson's testimony, we find no error.

Wright also testified that officers and directors of financial institutions have a "different" (as opposed to "higher") duty than officials of a regular business corporation. He reasoned that

"people put money in a savings and loan association ... to have it when they want it, to be able to go get it, and so when you are relating to any kind of business where 95 cents out of every dollar you use belongs to somebody else and is subject to call at anytime they want to call it, you have to operate your business in the light of that circumstance."

This evidence was consistent with the court's instruction that the jury might consider "that circumstance," an instruction which we approved in Part V.A., *supra.*

## B

Under a single argument heading appellants combine assertions of error in the admission of the FHLBB reports of examination and in the admission of testimony concerning standards for federal associations. None of these alleged errors has been preserved for review.

■■■ The defendants moved in limine to preclude MDIF's expert witnesses from testifying that the defendants' conduct did not conform to federal statutes and regulations, and they moved to preclude admission of the FHLBB reports on CSL and on EPIC Holdings. Those requests were denied. Denial of a motion in limine, without more, does not preserve for appellate review the propriety of later admitting specific evidence which falls within the scope of the issue raised by the motion. "If the trial judge admits the questionable evidence, the party who made the motion ordinarily must object at the time the evidence is actually offered to preserve his objection for appellate review." *Prout v. State,* 311 Md. 348, 356, 535 A.2d 445 (1988).

At oral argument on the motion in limine the defendants contended that the reports contained opinions on the ultimate issues which, defendants argued, were inadmissible. They relied on the Eleventh Circuit's opinion in *Rainey v. Beech Aircraft Corp.*, 784 F.2d 1523 (11th Cir.1986), *on rehearing*, 827 F.2d 1498 (11th Cir.1987), which held that under Fed.R.Evid. 803(8)(C) evaluative conclusions or opinions, even if contained in an investigatory report, were excluded from evidence as hearsay.[9] MDIF, on the other hand, argued for admissibility, relying on *Ellsworth v. Sherne Lingerie, Inc.*, 303 Md. 581, 495 A.2d 348 (1985). The circuit court rejected the defendants' argument.

The FHLBB reports were offered during the direct examination of Susan Andrews, who had authored, or participated in authoring, the reports. When the report on CSL was offered defense counsel stated that "we have an objection to some portions of the document that relate to opinions that we have talked about before." The court ruled that it would admit the exhibit at that time "with the proviso that [the court was] going to look at it in more detail and there may be some portions of it which will be blacked out" and which would not go to the jury. When the FHLBB report on EPIC Holdings was offered, and the court inquired if there were any objection, defense counsel replied: "No, your Honor, subject to the same limitations cited before, no objection."

Thus, the defense limited its objection to the reports to opinions contained therein expressing ultimate conclusions. *See von Lusch v. State*, 279 Md. 255, 263, 368 A.2d 468 (1977). Appellants have not directed us to any place in the record where they followed up on the conditional admission of the reports by moving to have redacted from the reports specific material which fell within the scope of the objection made when the reports were offered. Consequently the

---

**9.** After the trial in the matter before us, the Eleventh Circuit's holding on the Fed.R.Evid. 803(8)(C) issue was reversed. *See Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988).

evidentiary record closed and the matter was submitted to the jury with the reports in evidence in their entireties.

Appellants also refer to numerous places in the testimony of various witnesses where references to the FHLBB reports are made, or where the witnesses discuss federal regulations relating to such matters as percentage of assets invested in a subsidiary and brokered savings accounts. The brief does not cite record references as reflecting that any objection was made to any of this testimony. Indeed, appellants seem to rely for preservation on the motion in limine. We have also examined the record, where appellants have cited to the testimony complained of, but we do not find that any objections were made.

C

Buckford Ashby Wallingford, II (Wallingford) was qualified by the defendants as an expert in a number of fields, including economics and banking, but not taxation. In part of his testimony Wallingford explained that, in the years around 1980, traditional savings and loans were invested in low, fixed rate mortgages while interest rates had climbed dramatically. One countermeasure, he explained, was for an association to attract new deposits which could be invested at the current higher interest rates. A graph that he prepared was put in evidence. It reflected that savings deposits at CSL, after the acquisition of its stock by Billman and McCuistion, rose from under $100 million in late 1982 to nearly $500 million by December 1984. That exhibit further reflected that deposits dropped following the Ohio bank crisis in the first quarter of 1985. In another exhibit Wallingford graphed CSL's quarterly net income for the same period and demonstrated that it fell from nearly $2.5 million to a loss of more than $500,000 in the quarter when the Ohio bank crisis occurred.

Wallingford also prepared two exhibits which the court rejected. One addressed 1981–1982 and compared (1) the percentage decline in regulatory net worth and (2) end

of period regulatory net worth as a percentage of savings balances, between CSL and all federally insured institutions. The second rejected exhibit was a line graph showing from March 1981 through March 1985 net worth as a percentage of savings for CSL and for all FSLIC insured associations. The trial court ruled that the comparisons were "going so far afield from what is really necessary in this case." Further, the court thought that the comparisons were somewhat confusing and would not help the jury. A trial judge has a very broad discretion in determining relevancy. There was no abuse of discretion in declining to enlarge the scope of this already lengthy trial to embrace comparisons, and the rebuttals they might incite, to all federally insured associations over a period of years. *See Reeve v. Dennett*, 145 Mass. 23, 28, 11 N.E. 938, 944 (1887) (The collateral issue objection "is a purely practical one,—a concession to the shortness of life."); E. Clearly, *McCormick on Evidence* § 185, at 546 (3d ed. 1984).

Wallingford testified on the seventh day of the defense case which was the thirty-ninth day of trial. On the twenty-eighth day of the defense case (the sixtieth day of trial), Edward McGuirk (McGuirk), a consultant to savings and loans, testified. He did not claim to be an expert in regulations. McGuirk explained how associations were squeezed by the need to pay high interest on deposits when the yield on mortgage investments frequently was limited by state usury statutes. He described the federal legislative response which gave federal institutions "a competitive advantage over the MSSIC insured institutions." McGuirk favorably compared aspects of CSL's business to that of other institutions which he had advised. In his opinion CSL's level of "other income" was safe and sound. McGuirk said that, as of December 31, 1984, CSL "was a vibrant, viable institution that would have been viable into the future had the MSSIC system not collapsed." He pinpointed the Ohio crisis as the beginning of a loss of confidence which spread to MSSIC insured associations.

He presented a number of exhibits reflecting the silent run on CSL following the Ohio crisis.

 McGuirk also prepared six exhibits which compared CSL to all state chartered, capital stock associations in California, Florida and Texas and to all state chartered, FSLIC insured associations in the Atlanta based district of FHLBB which encompasses Maryland. The trial court would not admit these exhibits, essentially on relevancy grounds. By his own admission McGuirk was not competent to compare the regulatory environments between the different states. Comparison to FSLIC insured associations in an entire FHLBB region presented only to a lesser degree the same problem of enlarging the case which the Wallingford proposed exhibits had presented. We find no error.

Appellants seek to blend these rulings into a theme of unfairness to the defense. They say that MDIF witnesses were permitted to refer to federal regulations (see Part VI.B., *supra*), but that the defense was denied the opportunity to rebut. MDIF's references to federal regulations principally had to do with specific types of investments made by CSL. Early on in the case the trial court adopted the position that federal regulations had evidentiary value bearing on the common law standard of care. The Wallingford and McGuirk proposed exhibits did not undertake to rebut that point. Their proposed exhibits dealt solely with operations performance on a composite basis of state, regional or national groupings of associations.

### D

The defense called Charles Brown (Brown), director of DSL from February 1976 to August 1985. Through him defendants unsuccessfully sought to introduce the text of statements which he made in June 1984 before a savings and loan task force and in November 1984 before the Maryland Senate Finance Committee. The statements are basically historical reviews. In the June statement he said

that "[a]ctually, there is nothing wrong with investing out of state if the association has good underwriting procedures in place and has the expertise necessary to make such investments." Speaking to brokered deposits, sometimes referred to as "hot money," Brown said that brokered savings "have always been around and[,] if well managed, can be profitable." Defendants say that these statements contradict criticisms of out of state lending and of "hot money" included in MDIF's case.

The trial court would not admit the documents and would not permit Brown to testify on those subjects because the defendants had not designated Brown as an expert. Consequently, MDIF had not deposed Brown. We see no error.

Appellants say that the documents should have been admitted as evidence of facts, namely, what Brown told the two investigating bodies. The purpose, however, was not to prove verbal acts by Brown on those occasions but to present as substantive evidence Brown's opinion on the propriety of the two practices involved.

The trial court also excluded from evidence going to the jury a memorandum of July 1984 from Brown to a legislative task force. In that document Brown referred to the 1983 amendment to FI § 9–419(c). We considered that document in construing that statute. See Part IV, *supra.* The only relevance of the document is its possible bearing on that question of law. Hence, there was no error.

The circuit court would not admit into evidence minutes of a meeting of the Commissioners on May 9, 1985, during the run on Old Court. By agreement with Old Court, MSSIC had installed its own manager at Old Court in lieu of a court appointed conservator. The proffered minutes recognize the probability that MSSIC would be wiped out if the then current runs on Old Court and on Merritt Savings and Loan continued. There was ample, other evidence supporting the defense theory that the savings and loan crisis was the superseding cause of the loss to CSL.

That theory was submitted to the jury, which rejected it. There was no reversible error in excluding the minutes.

E

We next consider rulings arising during the testimony of Barry Friedman (Friedman), a CPA called as an expert by the defendants. The rulings relate to Count I, the loss on loans to EPIC entities. As of September 5, 1985, those loans totaled $82,255,381. Of this amount $27,691,140 was due directly from public (*i.e.*, non-insider) limited partnerships, and $9,853,258 was due from entities involved in the real estate agents network. Further, EPIC owed CSL $14,720,692, and EPIC Mortgage, Inc. (EMI) owed CSL $29,990,291. In McPherson's judgment no more than $1 million would be realized from equity in the partnerships, and the defendants were entitled to an additional credit of $32 million. The credit represented the then present value of a note in the face amount of $40 million which MDIF had received from a corporation formed as a vehicle for the bankruptcy workout of various EPIC entities. MDIF contributed to the workout its claims against EPIC and EMI, plus other assets, and the note was in consideration of those contributions. Under McPherson's testimony, and after all credits, the damages claimed on Count I were $49,255,381. That was the amount of the verdict on Count I.

On Friedman's direct examination the witness was referred to McPherson's testimony. Friedman said that McPherson did not "qualify" the Count I loss in terms of a year. Friedman said he would do that by reviewing post September 5, 1985, financial statements and that "the only document that [he] could get to review was" a report to the circuit court by MDIF, as CSL's receiver, for the year ending April 8, 1987. There was an objection. In a long colloquy defense counsel's ultimate proffer was that Friedman would say that "there would have been no loss to the outstanding amount ... by the end of 1985, if the activities

of [CSL] and EPIC were not stopped." The trial court would not permit the proffered opinion.

This ruling was correct. The defendants at first indicated that Friedman would testify that CSL would have suffered a lesser amount of damages on Count I than MDIF was claiming, were it not for the lack of federal insurance and for the receivership. On that theory the evidence was irrelevant. If the various loans involved were grossly negligent when made, the amount of damage was the amount which had been loaned, reduced only by *actual* receipts. *See Corsicana Nat'l Bank v. Johnson,* 251 U.S. 68, 86–88, 40 S.Ct. 82, 64 L.Ed. 141 (1919). If the evidence were directed to causation, it was speculative. Under the proffer Friedman's opinion was based on direct projections of earnings from prior years derived from financial statements in evidence, as well as on the receiver's report. The proffer, however, did not include an offer of proof that all other relevant, substantial factors remained substantially the same in the projected period as in the base period so that a direct projection would be appropriate. For example, the proffer did not explain how the evidence of an increasing inventory of unsold EPIC product and of an increasing number of maturing limited partnerships would factor into the opinion.

■■■ As part of the same ruling the court excluded the receiver's report. Defense counsel proffered that the report "represented to the Court, that [the receiver] believed that the loss to the estate would be approximately $65 million." We do not find a projection of a $65 million loss expressed in the report. The proffer did not include a sufficient explanation of how Friedman reached the proffered result.

Further, the receiver's report is irrelevant to the actual loss on the EPIC loans claimed against the defendants. The deficiency in the receivership estate between the amount owed to creditors and the amount realized on all assets deals with a larger universe than the value of

amounts owed to the insolvent. Any net deficiency for the total estate projected in the receivership report does not form a ceiling on the claim in Count I.

Finally, we are at a loss to see prejudice in the ruling. The claim on Count I was some $49 million while the loss proffered to be shown by the excluded exhibit was $65 million.

### F

The argument of appellants that we now consider relates to Count VI of the complaint, MDIF's claim based on excessive compensation. The trial court terminated the examination, and struck the testimony, of defendants' expert, Edwin Mruk (Mruk), as to the reasonableness of the compensation paid. Appellants argue that their testimony was erroneously restricted to comparisons to compensation paid in stand alone associations, but that the plaintiffs' proof was not so restricted, in that MDIF's evidence considered the compensation received by the defendants from the entire enterprise. Appellants' point is meritorious.

Count VI alleges that the defendants caused CSL "and its affiliates and subsidiaries" to spend imprudent amounts of money, in violation of the "dual fiduciary duties of care and loyalty to [CSL] and its affiliates and subsidiaries." Count VI further alleges that the defendants' conduct caused damage of at least $50 million. The evidence in this case does not approach damages in that amount on Count VI without including moneys received by Billman from EPIC Holdings.

In its case in chief MDIF devoted a fair portion of Carpenter's testimony to reviewing all payments to the defendants by CSL and its subsidiaries, by CSL's parent companies, and by other companies, known as personal companies. A plaintiffs' exhibit, covering the thirty-three months ending September 30, 1985, totalled these payments to Billman at $48,127,216 and to all defendants at $56,929,-468. Of these totals the payments to Billman from parent

companies were $43,821,072, and the payments to all defendants from parent companies were $49,169,788. Most of the money paid from parent companies was in connection with the February 1985 reorganization.

Another plaintiffs' exhibit introduced through Carpenter summarized only salaries, bonuses and fees paid to the defendants for the thirty-three months ending September 30, 1985. Billman's total was approximately $2.3 million while that of all individual defendants was approximately $6.3 million. The exhibit presented payments by CSL and its subsidiaries, by parent companies, and by personal companies.

As a result of numerous objections and bench conferences during this portion of Carpenter's testimony, MDIF represented that its next witness, and not Carpenter, would be the damage witness on Count VI. The trial court gave a cautionary instruction at that time, advising the jury that the amounts to which Carpenter was testifying were "not necessarily amounts that the plaintiffs are claiming are any measure of damages in this case."

MDIF's witness on the reasonableness of compensation was Wright. Wright testified that Billman's compensation from CSL was grossly excessive. He pointed to the CEO of a financial institution with sixty times the assets of CSL who made less money than Billman. If performance were taken into account, Wright said, then Billman should have gotten nothing from CSL.

Wright was also asked on direct whether there is "any relationship in industry standards between what a person gets paid from a subsidiary and if they are also getting paid from a holding company, that combined compensation...." Wright said that "directors should consider the total amount that the individual is receiving from the entire enterprise." In Wright's view "the combined amounts Messrs. Billman, McCuistion, Deerin and Meltz were getting from the entire enterprise" were "tremendously excessive."

In the defendants' case the court initially accepted Mruk as an expert on compensation. For many years Mruk headed the executive compensation department of a big eight accounting firm. For about two decades he has co-authored an annual book reflecting levels of compensation for business executives in various industries based upon confidential data obtained from up to fifteen hundred companies. He consulted on compensation issues with diversified financial services corporations and with banks, but never with a savings and loan association. Mruk explained the components of compensation generally. He testified that he obtained information on the duties of the individual defendants' positions and on the corporate philosophy as to the goals of the compensation system from interviews with Billman and McCuistion.

Plaintiff objected. The court ruled that it would stop the examination of Mruk unless the defendants could show a foundation from empirical data justifying an opinion "that can be narrowed down to his views on compensation ... connected with [CSL]." The defendants pointed to testimony about the interrelated nature of the EPIC companies, but the court said that Billman "never really hit the big time financially, at least according to his own words, until [CSL] came on the scene."

Defendants then made an extended proffer. In the business of consulting on executive compensation, Mruk would routinely interview officials of a given client company. Thus, MDIF's hearsay basis for its objection was not well founded.

" 'If the statements, then, are attested by the expert as the basis for a judgment upon which he would act in the practice of his profession, it seems that they should ordinarily be a sufficient basis even standing alone for his direct expression of professional opinion on the stand, and this argument is reinforced when the opinion is founded not only upon reports but also in part upon the expert's first-hand observation.' "

*Attorney Grievance Comm'n v. Nothstein,* 300 Md. 667, 678–79, 480 A.2d 807 (1984) (citing E. Cleary, *McCormick's Handbook of the Law of Evidence* § 15, at 36 (2d ed. 1972)). *See also Consolidated Mechanical Contractors, Inc.,* 263 Md. 328, 336, 283 A.2d 154; *Scott v. Department of Social Serv.,* 76 Md.App. 357, 386–87, 545 A.2d 81 (1988).

It was further proffered that Mruk would then have compared the various individual defendants' compensation to that of persons in comparable positions in the financial services industry, as reflected in his own annual surveys. His opinion was that the amounts received by the individual defendants were within the range of reasonableness. For example, Billman's total salaries, bonuses, and fees received from CSL and from its parents and subsidiaries for the thirty-three month period was $2.2 million. The comparable data reflected minimum compensation of $1.69 million, a mid-point of $2.33 million and a maximum of $2.96 million.

In arguing to the jury counsel for MDIF reminded the jury that

"Mr. Wright said that the total amount that [Billman] got from all the companies was many times more than the amount that was reasonable, and he also told you that the money he got from [CSL] was not worth anything at all."

MDIF asked for total damages against the individual defendants, jointly and severally, of $3.4 million on Count VI. In closing argument MDIF took the position that money that came from EPIC Holdings should not be included as damages, in order to prevent double counting.

Thus, MDIF's witness was permitted to opine that the individual defendants' compensation was unreasonable by looking at the total compensation package from the entire enterprise of EPIC related companies, including CSL, while the defendants' witness, who was prepared to testify using the same compensation data as MDIF's witness, was precluded from presenting data tending to show that the salaries, bonuses and fees, including those from EPIC Holdings, were reasonable. It was error to limit Mruk's compar-

isons to compensation paid by stand alone savings and loan associations.

 MDIF's limitation of the damage claim on Count VI in final argument did not render the error non-prejudicial. The jury had already heard MDIF's evidence, but the jury never heard the evidence which would have placed MDIF's evidence in the perspective of the defense theory, namely, that the EPIC related companies were an integrated, financial services operation.

Thus, the judgment on Count VI must be reversed as to the appellants Billman, McCuistion and Meltz.

## G

One of the themes of MDIF's evidence was the lack of diversification of the EPIC product. Sixty percent of the portfolio consisted of residences in Texas. As of January 1, 1985, approximately 10,000 of the 18,000 homes owned by EPIC partnerships were homes in Texas. Richard Hewitt (Hewitt), a real estate valuation expert called by MDIF, said that by the late spring or early summer of 1985 many of the markets in Texas were in horrible shape. Carpenter testified, based on EPIC vacancy and rental records, that it was imprudent in March of 1985 for EPIC to spend $40 million in Texas out of $66 million spent that month on new product.

 Appellants focus on the exclusion of one exhibit which was designed by their expert, Wallingford, to rebut this evidence. Using data from the National Association of Realtors for median house prices for the entire United States, and for Dallas/Fort Worth, San Antonio, and Houston, Wallingford produced his own index, using the second quarter of 1984 as the base. Then, by line graph, extending through the fourth quarter of 1986, he demonstrated the four markets' interrelationships in terms of his index. Houston was almost always well below the U.S. median, San Antonio fluctuated in relation to it, and Dallas/Fort Worth was almost always a few index points higher. MDIF

objected to the graph, contending that the exhibit did not reflect the lack of market strength, already demonstrated by EPIC documents, because the exhibit was limited to properties which had actually sold. The court excluded the exhibit, saying that there was no foundation relating the data presented to the locations of the houses purchased by EPIC partnerships.

There is no error. Absent evidence clearly relating the exhibit to the EPIC product, the court, without abusing its discretion, could find that the exhibit had too little relevance to justify the time which would be required in direct and cross-examination to evaluate its probative value.

 The circuit court also properly excluded, as misleading, a tabulation by Wallingford. It reflected that EPIC loan origination fees paid to CSL, and deposits at CSL by EPIC and other CSL subsidiaries, exceeded by more than $6 million the loans outstanding to EPIC entities on December 31, 1984. The exhibit ignored the tax allocation payments and the dividends paid by CSL to EPIC Holdings.[10]

 The record is quite confused concerning appellants' next claimed error in the exclusion of evidence from Wallingford. From the limited proffer it appears that Wallingford undertook to compare CSL's net worth on an actual basis and on a hypothetical basis. Hypothetically, Wallingford considered CSL to be a stand alone association that enjoyed, from unrelated companies, all of the income which CSL actually received from its subsidiaries. It was proffered that Wallingford's comparison would show that CSL had a greater net worth as part of the EPIC group of companies than it would have had as a stand alone association.

The proffer is inadequate. In their brief appellants refer us to an exhibit, but the exhibit deals only with free cash and does not present the comparison outlined in the proffer. We cannot tell in what way, or for what years, Wallingford

---

**10.** In addition, deposits are liabilities, not assets of an association.

produced the hypothetical net worth. Further, the stand alone presentation would have to involve computing the tax liability for CSL, but Wallingford was not accepted as an expert on taxation.

## H

■ After McGuirk fully developed his theory that the losses at CSL had been caused by economic forces and by a lack of public confidence, defense counsel directed McGuirk to a new area. When the run started at CSL during the Maryland savings and loan crisis, CSL borrowed money which CSL in turn loaned to EPIC to continue funding the EPIC partnerships. McGuirk was asked to opine on the prudence of those loans. Objection was properly sustained because McGuirk had not qualified as an expert in loan underwriting. Further, any opinion required a knowledge of Maryland regulations, a subject beyond his expertise.

■ Appellants also challenge the exclusion of McGuirk's comparison of the insurance eligibility examination by FHLBB that was conducted at CSL with those conducted at other associations with which McGuirk had consulted. The record extract does not contain the objection, ruling or proffer. The point is not preserved. Maryland Rule 8–501.

## I

■ We now consider the allegedly erroneous admission of certain exhibits offered by MDIF during the examination of Hewitt. They are four memoranda from the files of EPIC or from Continental Appraisal Group, a company owned by Billman and McCuistion which rendered appraisal services for EPIC. The memoranda reflected efforts to have appraisals increased. Appellants' basis for challenge is that Hewitt could not identify the authors or recipients of the memoranda. The documents were offered as business records, and the custodian offering business records need not have any personal knowledge of the content of the

record. *Newell v. Richards,* 83 Md.App. 371, 398, 574 A.2d 370 (1990).

■ Appellants do not directly argue that Hewitt was not a custodian of the records. Even if there were an error on that score, any such error is not prejudicial. Without objection Hewitt had testified that, in his review of internal memoranda of Continental Appraisal Group, "there were constant references to [']the appraisal is not high enough,['] that [']it's not meeting indicated sales prices,['] or a break-even point, [']send it back to the appraiser,['] a variety of references in that respect."

## VII

Crysopt contends that the circuit court erred in granting MDIF's motion for judgment on Crysopt's fourteenth counterclaim. In that counterclaim Crysopt sought to recover $1,750,000, plus interest at fifteen percent per annum, on a seven year subordinated debenture executed November 30, 1982, by CSL which was payable to the order of Crysopt, Inc.[11] By the time of the January 31, 1985, agreement and plan of reorganization, the payee had changed its name to EPIC Holdings. The debenture was distributed to appellant Crysopt in that reorganization.

The subject debenture, as originally drawn, provides that the entire principal obligation is to be paid in one installment on November 30, 1989, while interest is to be paid monthly. The debenture then provides as follows:

"This indebtedness is subordinated on liquidation, as to principal, interest and premium, if any, to all existing and future indebtedness of [CSL] and to all other claims (including post-default interest) against [CSL] having the same priority as savings account holders or any higher priority; however, it is the intention hereof to qualify this

---

11. Crysopt, Inc. is the former name of one of the CSL parents, which we are collectively calling "EPIC Holdings." The appellant in this case is Crysopt Corporation, a separate entity. The name, "Crysopt," is a contraction of "crisis opportunity."

Debenture as capital of [CSL] to the same extent as the stockholders' equity therein."

MDIF points out that in the workout of CSL MDIF paid $131 million to Mellon National Bank in order to have the latter assume CSL's obligations to depositors. MDIF argues that it is impossible for the liquidation of CSL to produce an amount sufficient to satisfy all priorities above stockholders' equity so that, under the evidence, there is nothing which would be payable to Crysopt on the debenture. In a word, the Crysopt claim is worthless.

In its reply to that argument Crysopt does not challenge the numbers. Rather, it says that it does not seek to have cash distributed from the receivership to it on the debenture counterclaim. It seeks only to set off against the judgment against Crysopt the indebtedness to Crysopt from CSL on the debenture.

■■■ The effect of what Crysopt seeks is to bootstrap itself above the subordinated position which the debenture provides. The judgment against Crysopt is an asset of CSL. Any recovery on that judgment is distributable to depositors and creditors, including MDIF, as a subrogee of the depositors to the extent of unreimbursed moneys which MDIF has paid to make good the deposits. Reducing CSL's recovery against Crysopt takes money from the depositors and their subrogee for the benefit of Crysopt which, under the debenture, is not to be treated at a distribution level higher than that of a shareholder. Under the evidence, there will be no distribution to CSL's shareholders. Thus, there was no prejudice in granting a motion for judgment in favor of MDIF on Crysopt's fourteenth counterclaim, even if it were technically improper to do so.

## VIII

■■■ The final submission by appellants is that, as a matter of law, there is a duplication of $39,615,928 in the verdicts on Counts IV and V with the verdict on Count I. The theory is that the loans by CSL to the EPIC entities,

the losses on which form the claim in Count I, are moneys which were in turn paid to EPIC Holdings as fees and tax payments claimed in Counts IV and V. In order for there to be a duplication as a matter of law, the borrowing EPIC entities would have to have been substantially static, without generating any income from their own activities. That was not the case. Thus, duplication between claims was a factual question. Defendants presented, through the accountant, Friedman, evidence tending to show duplication, and the matter was argued to the jury. The jury did not so find.

A spin which appellants put on this argument is that MDIF actually was seeking to recover for losses to subsidiaries, claims which CSL, as shareholder, cannot assert. We have already rejected that argument in Part III, *supra*.

JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY IN FAVOR OF THE PLAINTIFFS REVERSED AS TO COUNT VI ONLY, AND ONLY AS TO THE DEFENDANTS BILLMAN, McCUISTION AND MELTZ. CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR A NEW TRIAL AS TO THE DEFENDANTS BILLMAN, McCUISTION AND MELTZ ON COUNT VI. IN ALL OTHER RESPECTS THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY IS AFFIRMED. COSTS IN THIS COURT TO BE PAID NINETY–SEVEN PERCENT BY TOM J. BILLMAN AND CRYSOPT CORPORATION AND THREE PERCENT BY STATE OF MARYLAND DEPOSIT INSURANCE FUND CORPORATION, AS RECEIVER OF COMMUNITY SAVINGS & LOAN, INC.